(Decded 26th March, 1889.)

---

HENRY G. DAVIS, and THOMAS B. DAVIS, trading as HENRY G. DAVIS & CO., WILLIAM A. BRYDON, and others *vs.* THOMAS GEMMELL and MALCOLM SINCLAIR.

*Corporations—Contract—Rights of Stockholders—Individual Judgment treated as the Property of a Corporation—Bona fide Assignees without Notice—Acquiescence—When Equity will Interfere at the instance of Stockholders.*

A bill was filed by the appellees, as stockholders of the North Branch Company, and also on the part of creditors of the company, against the company, and William A. Brydon, president and one of the directors thereof, and Henry G. Davis & Co., and the Baltimore and Ohio Railroad Company, to restrain the collection of a judgment of $75,000 recovered by said Brydon against said

Davis & Co., *et al. vs.* Gemmell and Sinclair.

Railroad Company, and to have the entry of said judgment to the use of the said Henry G. Davis & Co., stricken out, and the judgment itself declared to be the property of the said North Branch Company. The ground of the application was that the contract made by Brydon with the Baltimore and Ohio Railroad Company, for the breach of which the judgment was recovered, was a contract on behalf of the North Branch Company, and not with Brydon, as an individual, who was at the time president of the company. HELD:

1st. That the complainants were *bona fide* stockholders of the North Branch Company.

2nd. That the contract made by Brydon in his own name with the Railroad Company, while he was president of the North Branch Company, must be treated as a contract on behalf of the North Branch Company, and the judgment recovered for the breach thereof, must be treated as a judgment recovered in favor of that company.

3rd. That the complainants, as stockholders, had the right to file their bill, because the wrong complained of was one committed by the corporate authorities, and they were not, under such circumstances, proper persons to conduct a litigation against themselves.

4th. That Henry G. Davis & Co., had notice that the contract, although made by Brydon in his own name, was in fact a contract on behalf of the North Branch Company, and they were not to be treated as *bona fide* assignees without notice.

5th. That there was no such acquiescence on the part of the complainants as to disentitle them to file their bill as stockholders of the North Branch Company.

All actions in regard to the rights and interests of a corporation must, as a general rule, be brought by the corporation itself. This is a matter for the corporate authorities themselves, and not for the stockholders to determine. But if the directors, or officers of a corporation having the authority to direct its litigation, are themselves guilty of the wrong complained of, a Court of equity will interfere at the instance of the stockholders, and this, too, without proof of a demand and refusal on the part of the corporate authorities.

APPEAL from the Circuit Court of Baltimore City.

This appeal was taken from an order of the Court below (DUFFY, J.) overruling the motion for the disso-

lution of the injunction, and continuing the same till final hearing. The case is stated in the opinion of the Court.

The cause was argued before MILLER, STONE, ROBINSON, IRVING, BRYAN, and MCSHERRY, J.

*John Prentiss Poe, William Walsh,* and *Wm. Pinkney Whyte, Attorney-General,* for the appellants.

*William L. Marbury,* and *W. Irvine Cross,* for the appellees.

ROBINSON, J., delivered the opinion of the Court.

This is a bill by the appellees, as stockholders of the North Branch Company, to restrain the collection of a judgment of $75,000, recovered by William A. Brydon against the Baltimore and Ohio Railroad Company, and to have the entry of said judgment to the use of Henry G. Davis & Co. stricken out, and the judgment itself declared to be the property of the North Branch Company.

This Company was chartered in 1867, with a capital stock of $100,000, divided into 1000 shares. The appellees now hold certificates for 498 shares, and the remaining shares are held by William A. Brydon, the President of the Company. Although the holders of the certificates of stock, the appellees, it is contended, are not *bona fide* owners of the stock for value, and this is the first, and in our view, the main question in the case. As Sinclair is claiming under Gemmell, his title will be considered as depending on the title of Gemmell. The whole capital stock of the North Branch Company, it is admitted, was paid for, not in money, but by the conveyance to the Company of a tract of land called "*Llangollan,*" afterwards known as the "*Bloomington*

*property,"* and later still as the *"North Branch Mine,"* containing two hundred and fifty acres. This property, according to Brydon's testimony, was bought by him of the Gouverneurs, in May, 1864, for $4600, but owing to some difficulty about the title he did not get a deed till October following, at which time he paid $1000, and gave a mortgage for $3600, the balance of the purchase money, and which still remains unpaid. He was, at the time of the purchase, the superintendent of the Hampshire and Baltimore Coal Company, and Gemmell was its president, living in New York. Some time in the summer of 1864, Gemmell, while on a visit to the Hampshire Mine, went with Brydon to look at the Llangollan purchase, and after a careful examination of the coal, expressed himself as being pleased with its quality, and said he should like to buy for himself some of the six foot vein coal property. Brydon then told him that the Smoot and Miller property adjoining was for sale, and, at his request, Brydon promised to make an effort to secure for him the option of purchase.

In August of the same year Gemmell went to England, and on his return in the latter part of January, 1865, he made a second visit to the Hampshire Mine, and during this visit Brydon informed him that he had been unable to make any arrangement for the purchase of the Smoot and Miller tract. After some further conversation, Brydon, at Gemmell's request, agreed that he should have a joint interest in the Llangollan property, upon condition that he should pay one-half of the purchase money, and also contribute one-half of the money necessary to open and develope the mine. In pursuance of this agreement, the Savage and North Branch Company was in a few few weeks afterwards organized, with a capital stock of $250,000, and Brydon conveyed to it the Llan-

gollan tract, with the exception of fifty acres reserved by him for a dwelling-house, and some lots reserved for building purposes. Immediately upon the organization of the Company, they began to open and develope the mine, and by January, 1866, no less than $11,000 had been expended in mine improvements. Brydon further testifies, that Gemmell has never paid any thing, either towards the purchase money, or towards the moneys expended in improving the property.

On the other hand, Gemmell testifies, that the Llangollan mine was purchased by Brydon of the Gouverneurs on the joint account of Brydon and himself, with the view of organizing a coal company; and that the Savage and North Branch Company was incorporated, and the property conveyed to it by Brydon in pursuance of this agreement. And, further, that he has fully paid not only half the purchase money, but also one-half of all the expenses incurred in its improvement, and that his interest in the property, and his title to the stock now held by him, and the stock transferred to Sinclair, were never questioned by Brydon till after the recovery of the judgment of $75,000 against the Baltimore and Ohio Railroad Company.

If the case rested here, there might be some difficulty in getting at the real merits of this controversy. But, fortunately, we are not obliged to decide this case upon the conflicting testimony of the parties themselves, taken after this litigation had begun. On the contrary, all through the eight hundred pages of this record, is to be found the correspondence between Brydon and Gemmell, in reference to the purchase of this property, and their respective rights and interests in it, beginning as far back as June, 1864, before the Gouverneur deed to Brydon, and coming down to May, 1875, when the coal contract with the Baltimore and Ohio Railroad Company was made, for the breach of

Davis & Co., *et al. vs.* Gemmell and Sinclair.

which the judgment was recovered; and in addition to this, we have exhibits and statements in regard to the dealings and transactions between them, all in the handwriting of Brydon himself, made years ago, when there could be no object to misrepresent, which show beyond question, that Gemmell was not only a joint purchaser of the Llangollan tract, but that he has paid, and more than paid, his one-half of the purchase money, and one-half of all the moneys expended in opening and developing the mine.    The statement now made by Brydon, that he bought the Llangollan property of the Gouverneurs *in May,* 1864, *on his own account,* and that he never agreed to let Gemmell have an interest in the purchase *till January,* 1865, is not consistent with his written declarations made at the time.    In a letter to Gemmell, dated 3rd of June, 1864, nearly six months before he got the Gouverneur deed, referring to the trouble about the title to the property, Brydon says, "The son (Gouverneur's son) who, as you are aware, has a half interest in the property, finding, as I suppose, that I have got the best of the old man, is making himself troublesome. ˙ If I find the young man obstinate, I have got a tack which may run them ashore, if I am driven to it."

. Ten days afterwards, June 11th, he writes again, "My visit to Frederick was not altogether a success. The true title is in Thomas Devecmon as trustee.    All Devecmon has to do is his duty as Gouverneur's trustee and my lawyer, and all must come right."

In August following Gemmell went to England, and in a letter to him dated 26th of September, 1864, Brydon says, "I have still been unable to close this Bloomington property (the Gouverneur property).    The son manifests the most obstinate nature possible, but I have got Devecmon at last fully alive to the necessities of my case.    I feel confident that he will shape things to our wishes."

Now, the agreement for the purchase was made in May, 1864, and from that time in letter after letter, Brydon keeps Gemmell fully advised as to the trouble about the title to the property, and the steps taken by him to overcome the objections made by Gouverneur's son; and in September, just before he got the deed, he expresses himself as being confident that Devecmon "will shape things" not according *to my wishes,* but according *"to our wishes."* And in corroboration of these letters, Gemmell says, before leaving for England, he had some conversation with Brydon in reference to the purchase of a coal cutting machine to be used in the mine. Now, in a letter to Gemmell after his arrival in England, dated 23rd of October, 1864, Brydon says: "Remember if the machine proves a success here, from the location, including the depot right *we own,* and remembering the revolutionary state of things it would produce at the North Branch, would render *our* property ten fold the estimated present value.  *  *  * Should the expected suspension of coal business take place it would give us a considerable lift in opening our mines." On the 26th October three days after the above letter, referring to Gemmell's proposition to convey a one-half interest in the property in return for a one-half interest in the new coal-cutting machines, Brydon says "I have given the subject in regard to our contemplated company's affairs much of my mind since my letter from Baltimore. What do we get in return for one-half of our property, is simply a single machine, &c."

In these letters all written in 1864, before and immediately after the execution of the Gouverneur deed, he speaks of the property as *"our property,"* the depot right as one "we own," "the lift in opening *our mines"* and "the subject of our contemplated company's affairs." And now he testifies that Gemmell never

had any interest in the Gouverneur purchase till after his return from England in January, 1865.

So much, then, for the corespondence between the parties prior to the organization of the Savage and North Branch Company. This company was incorporated in February, 1865, and Brydon says Gemmell never had any stock of his own in this company. And yet in a letter to Gemmell dated 2nd of February, 1865, in reference to an arrangement which they were entering into with the Messrs. Rieman & Co. for the sale of coal from the Savage and North Branch Mine, Brydon says, "On my return to Baltimore, I saw Messrs. Rieman & Co.," and "entered into what I regard, taking into consideration their character and influence, an exceedingly favorable and advantageous arrangement for hauling *our coal*. As I found Mr. R. possessing quite a stock mania, as a sugar plum I promised him 300 to 400 shares of *our stock*." And on the next day, Feb. 3rd, " I write this second edition to inquire if you have any, and if so, what objection, to me selling, if I can accomplish the sale, of *one-half of the stock* of *our company*, to Rieman & Co. for say $50,000 cash?"

In the meantime Gemmell, as president of the Hampshire Company, it seems, had made a contract with Rieman & Co. to supply them with Midland Coal from a mine belonging to that company; and in a letter to Gemmell, February 13th, Brydon speaks of Gemmell's having sacrificed secondary to primary interest, and says that he (Brydon) must either sell out or become the absolute owner of the company. Now in all this correspondence Gemmell's interest in the Gouverneur purchase, and his rights as a stockholder in the Savage and North Branch Company are admitted and recognized by Brydon in the most explicit and unqualified terms.

But this is not all. Immediately upon the organization of the new company, they began to open the

mine, and by the 1st January, 1866, they had expended about $11,000 in mine improvements. All the money thus expended was advanced by the Hampshire Company, and in part settlement of this indebtedness, the Savage and North Branch Company gave to the Hampshire Company, its note for $5440.88, and the balance of the $11,000 was paid to the Hampshire Company, as we shall hereafter see, by Henshaw & Co., and charged to Brydon and Gemmell, one-half each, both of whom were members of that firm. The efforts, however, to operate the mine proved unsuccessful, and being unable to pay its debts, the Savage and North Branch Company, with the consent of all parties in interest, and with the view of organizing a new company made an assignment of its property to Messrs. Kean and Devecmon for the benefit of its creditors. On the 6th April, 1867, all its property was sold to E. R. Brydon brother of William A. Brydon for the nominal sum of $10,000. In the audit of the trust estate William A. Brydon filed an account of $11,000, being the amount expended in improving the Savage and North Branch Mine, and being the sole creditor, the entire proceeds of sale were audited to him. On the 26th February, 1868, the entire property of the company was conveyed to E. R. Brydon, and on the same day, he conveyed it to the North Branch Company, which had been organized as the successor of the Savage and North Branch Company, with a capital stock of $100,000 divided into 1000 shares. On the same day, E. R. Brydon subscribed for 994 shares of the stock of the new company, all of which were issued to him as full paid shares, in consideration of the property thus conveyed by him to the company—the remaining six shares being distributed among the six incorporators named in the charter. Of the 994 shares thus issued to E. R. Brydon, he on the 2nd May trans-.

Davis & Co., *et al. vs.* Gemmell and Sinclair.

ferred 487 shares to William A. Brydon, and 487 shares
to Gemmell, and 10 shares to Alexander Gemmell.
It thus appears, that the whole capital stock of the
North Branch Company was paid for by the convey-
ance to it, of the property of the Savage and North
Branch Company, and its stock was issued to E. R.
Brydon, and by him transferred to William A. Brydon
and Gemmell, who were in fact the real purchasers of
the Savage and North Branch Mine. In all these pro-
ceedings Gemmell is fully recognized as joint owner
of the stock of the Savage and North Branch Com-
pany, and when that company went out of existence
and the North Branch Company, its successor, was in-
corporated, 487 shares of its stock was issued to him
as full paid shares with the knowledge and consent
of William A. Brydon. And yet, in the face of all
this, Brydon now testifies that Gemmell never paid
a dollar on account of the purchase of the Savage
and North Branch Mine, nor on account of its improve-
ment, and that he considered Gemmell as having for-
feited all right to be considered as joint owner of the
property, as far back as January, 1866. But further
than this, in a letter to Gemmell 5th May, 1868, only
three days after the 487 shares of stock had been trans-
ferred to him, Brydon says, "On examination I am now
fully satisfied that your views in regard to the notes,
&c., are perfectly correct. E. B. (E. R. Brydon) sim-
ply deeded the property unincumbered to the company
for $10,000, receiving as it were the 994 shares of stock
at that valuation. As the money *was paid by us,* he,
of course, transferred the stock to us." Here, then,
is an unqualified admission by him that the 487 shares
of stock of the North Branch Company were trans-
ferred to Gemmell and himself, in consideration of the
payment by them of the purchase money of the prop-
erty which E. R. Brydon had conveyed to that com-
pany.

But this is not all, in a letter to Gemmell, 30 April, 1867, Brydon says: "Judge Hammill yesterday requested me to say to you that he would give you $1000 cash in hand for your half interest in the *Warnock property*. Now, as I stated to you that in consideration of the reservation in the Bloomington property (the Gouverneur purchase,) made for the benefit of myself, I gave you all the interest in this transaction I had acquired by the payment of $825."

Now if Gemmell had forfeited all right to be considered as joint owner of the Gouverneur purchase in January, 1866, by reason of his failure to pay anything either towards the purchase money, or towards improving the property, and Brydon was himself *the sole owner*, we cannot understand why in 1867, more than a year aftewards, he should treat Gemmell as owner of the Warnock property, which Brydon had agreed to give him in consideration of the fifty acres reserved by Brydon in the deed of the Gouverneur tract to the Savage and North Branch Company. If Gemmell had forfeited all interest in the stock of that company, he had forfeited all interest too in the Warnock property. But passing from these admissions and declarations on the part of Brydon, we come to the letters of Gemmell to Brydon, after the incorporation of the North Branch Company. From the time of its organization in 1868 down to 1874, no further efforts were made to work the mine. In the latter year however, the Baltimore & Ohio Railroad Company was induced to try the use of the six foot vein coal of the North Branch mine. And in a letter to Brydon, 21st of July, 1874, Gemmell says: "I think money can be made by the working of the mine if it is managed in a systematic and economicnl manner. I will give you my ideas and state what I expect to be done as *owner of nearly a moiety of the stock.*" He then goes on to say: "Regular

and accurate accounts must be kept," &c., and that "we must not think of using any of the company's funds for our personal purposes till we get the company squarely on its legs." He makes Sinclair his representative, and expresses a wish in this letter, that he shall be consulted in all matters connected with the operating of the mine. In the meantime Gemmell transfers 200 shares of North Branch stock to Sinclair, and in August 1874, Brydon, as president, issues new certificates of stock to both Gemmell and Sinclair, and this, too, upon the request of Gemmell in a letter distinctly claiming the *ownership of the stock*. Again in a letter to Brydon dated 26th of September, 1874, Gemmell says: "In starting the mine now, it is absolutely necessary that you start right in the matter of accounts, and *I, as owning about half the stock, claim it as* due to me." We might refer to quite a number of other letters containing like admissions and declarations, both on the part of Brydon and Gemmell, but this we deem unnecessary. All of this correspondence between them took place years ago, and at a time when there was no motive to misrepresent the facts in regard to the rights and interests of the parties in the Gouverneur purchase, and in the stock of the Savage and North Branch, and the North Branch Companies; and it shows how utterly groundless is the contention now set up by Brydon. It shows not only his own repeated admissions of Gemmell's interest in the original purchase of the Gouverneur tract, and his rightful ownership of the stock transferred to him, but also the demand on the part of Gemmell to advise and direct the management of the mining property on the ground of his ownership of one-half of the stock of the company.

In addition to this, the memoranda and statements made out by Brydon himself show the payment by Gemmell of his one-half of the purchase money of the Gouv-

erneur property, and of the money expended in its improvement.

To understand these it is necessary to refer briefly to some facts about which there is no dispute. In 1862, a co-partnership was formed between Brydon and Gemmell and E. R. Brydon for the purpose of carrying on a general merchandise business. This firm lasted one year, and a new firm was formed under the name of "W. E. Henshaw," the partners being W. A. Brydon and Gemmell—Henshaw being merely employed as manager of the store. This partnership lasted till September, 1865, when a new one was formed under the name of "W. E. Henshaw & Co.," with Brydon and Gemmell and Henshaw all as equal partners, and which continued till 1868, when it was dissolved by the withdrawal of Brydon. During the whole period of these several partnerships, Gemmell was president of the Hampshire Company and lived in New York and Baltimore, and Brydon was its superintendent living at Bloomington, where the store was carried on. Now the Savage and North Branch Company gave to the Hampshire Company, as we have seen, its note for $5440.80, in part settlement of the $11,000 advanced by that company for mine improvements. The amount due on this note was subsequently reduced by credits to $3780, and this sum was secured by a mortgage on the property of the North Branch Company, and which still remains unpaid. And the question is, how was the balance of the $11,000, amounting to between five and six thousand dollars, paid to the Hampshire Company? This, the balance sheet of Henshaw & Co. made out by Brydon himself in May, 1868, shows was paid by that firm, and charged to the accounts of Brydon and Gemmell. This balance sheet shows that Brydon had spent his entire capital, and was indebted to the firm $801.65, and among the debits

charged to him is the sum of $2996.28 paid by the firm.
to the Hampshire *Company, being one-half of the indebt-
edness of the Savage and North Branch Company.* And
in Gemmell's account we find he has $1256.89 to his
credit, and he is also charged *with* $2996.28 *paid by the
firm to the Hampshire Company,* being one-half of the
amount due that company by the Savage and North
Branch Company. So upon the face of these accounts,
it appears, that Henshaw & Co. paid to the Hamp-
shire Company $5992.56, as a debt due that company
by the Savage and North Branch Company, and that
one-half of this sum was charged to Brydon and one-
half to Gemmell. Brydon now says this balance sheet
is a mere hypothetical statement, made out by him at
the time, for the purpose of showing the interest of
each member of the firm, upon the assumption that
the Hampshire Company would take the firm for the
payment of the Savage and North Branch debt. But
this, it seems to us, is entirely inconsistent with Bry-
don's subsequent acts and declarations; for, within a
few weeks after this balance sheet was made, he writes
to Gemmell and offers to sell out his good will in the
firm of Henshaw & Co., upon being released from the
payment of $801.15, being the amount due by him to
the firm. Gemmell afterwards, of his own accord,
paid him $1500 for his interest, and Brydon withdrew
from the firm. Now, if this balance sheet was but a
mere hypothetical statement, then Brydon, instead of
being indebted to the firm $801.15, would have had to
his credit $2195.13, assuming that Henshaw & Co.
had not in fact paid the $2996.28, as charged in the
balance sheet against him; and Gemmell instead of
having $1256.89 to his credit, ought to have had
$1256.89 + $2996.28 = $4253.17. And, if so, Brydon,
it is clear, would not have offered to sell his interest
in the firm, on being released from the payment of

$801.15, which, according to his own explanation as now made, he did not owe. And so in regard to the $1000 paid by Brydon to Gouverneur on account of the purchase of the Llangollan property. The amount thus paid by him was advanced by the Hampshire Company, and afterwards paid by Henshaw & Co. and charged in the partnership accounts to Brydon and Gemmell. It may not be an easy matter to understand the somewhat conflicting exhibits and statements in regard to the dealings and transactions between Brydon and Gemmell, involving, as they do, not only their own individual and co-partnership dealings, but also their individual and co-partnership dealings with the Savage and North Branch Comany and the Hampshire Company, all of which took place nearly twenty years ago. But there is enough in this record to show, beyond question, the payment by Gemmell of his part of the original purchase money of the property, and his part too, of all moneys expended in opening and developing the mine, and that the 487 shares of stock of the North Branch Company, were transferred to him in consideration of his ownership in the property which was conveyed to that company. And it shows, too, that Brydon's mortgage to the Hampshire Company for $6780, was executed by him in consideration of his own individual indebtedess to that company.

Passing, then, from the question as to Gemmell's *bona fide* ownership of the stock held by him, and part of which was transferred to Sinclair, we come to the coal contract between Brydon and the Baltimore and Ohio Railroad Company, for the breach of which the judgment of $75,000 was recovered. Brydon was at the time it was made the President of the North Branch Company, and the coal to be delivered under it was coal belonging to the company, and we fully agree with the

learned Judge below, that the contract itself must be treated as a contract in behalf of the company, and the judgment recovered thereon must be treated as a judgment recovered in favor of the company. From the organization of the North Branch Company in 1868, till the summer of 1874, no further efforts were made to work the mine. During the latter year, however, owing to the scarcity in the supply of the big vein coal, Brydon and Gemmell were led to believe that the Baltimore and Ohio Railroad Company might be induced to use the six foot vein coal of the North Branch Mine, and to that end all their efforts were directed. Accordingly we find correspondence and personal interviews between them and the railroad officials in reference to the matter; and finally on the 21st day of July, 1874, Gemmell writes to Brydon: "I have the pleasure to inform you, the Baltimore and Ohio Railroad authorities have given orders for the replacement of the N. Branch siding." He then insists as owner of one-half of the stock of the company that its earnings, after the payment of wages, &c., shall be applied to the balance due on the Gouverneur purchase, and to the indebtedness to the Hampshire Company. And just here it may be proper, by way of explanation, to say a word about this indebtedness to the Hampshire Company. After the dissolution of the firm of Brydon & Co. by the withdrawal of Gemmell and Ravenscraft in 1870, the business was thereafter conducted by Brydon on his own account under the name of the old firm. He had resigned as superintendent of the Hampshire Company, and Sinclair had been appointed to succeed him. The former arrangement, however, by which the goods sold to the mines were charged to the Hampshire Company, and were paid by the latter company out of the wages due the miners, still continued, and Brydon still continued from time to time to draft on Gemmell, and

which were paid at maturity by the Hampshire Company. In this way it was found in 1873, that Brydon had overdrawn the wages due the miners to the amount of $7500, and this amount Gemmell and Sinclair and the Hampshire Company were afterwards obliged to pay, and of this amount Brydon has never paid a dollar. It is this indebtedness that Gemmell in his letter insists shall be paid out of the earnings of the mine.

The Railroad Company continued in October and November the use of the coal, now and then stopping its use because of the complaints of its firemen. It was of course of vital importance to the North Branch Company that there should be a contract for the regular supply of a definite quantity of coal to the Railroad Company, and in a letter to Brydon dated December 3rd, 1874, Gemmell says: "The redemption of the North Branch Company and of your and my interests, is to get a regular contract from the Baltimore and Ohio Railroad." On the 24th of December, Westhall, the supervisor of engines of the railroad, who had been directed to *test* the coal, reported favorably, and after his report the use of it by the Railroad Company largely increased, and by the 1st of May following the quantity delivered exceeded 14,000 tons. There did not now seem to be any apparent difficulty about making a contract for a regular supply of coal—it was merely a question of terms. After some further correspondence, Sharp, the Master of Transportation, on 24th of April, wrote to Brydon, requesting him to state the terms on which he was willing to supply the Railroad Company with coal. Instead of replying at once to this letter, Brydon borrows of H. G. Davis & Co. $3000 to be applied in the erection of dwelling houses for miners, and to secure the payment of which he mortgages the property of the North Branch Company. This mortgage is dated May 1st, and on May

Davis & Co., *et al. vs.* Gemmell and Sinclair.

4th, he replies to Sharp's letter of April 24th, and after stating the terms on which he is willing to supply the Railroad Company with coal he says: "The property I contemplate *opening being individual,* the contract will require to be made with me personally." Only three days before the date of this letter, the property "he contemplated opening" was the *property of the North Branch Company,* and *as such he had mortgaged it to the Messrs. Davis & Co.* Now, however, it was his *individual property,* and on the 14th of May he makes a contract in his own name with the Railroad Company for the supply of not less than 150 tons, nor more than 300 tons, daily to the company. Now, it will be observed that all the negotiations leading up to the contract were carried on by Brydon, as President of the North Branch Company, and in all of which he had expressed himself as being anxious and desirous of making a contract in behalf of the company with the railroad officials; and further that the coal to be delivered under it, was coal belonging to that company. It can hardly be necessary to say, that a contract made under such circumstances, although made in his own name will be treated as a contract made in behalf of the company of which he was the President. And to escape this, the attempt is made to prove, that the contract in his own name was made with the approval of a majority of the Board of Directors of the North Branch Company, and was subsequently ratified by them, on condition that Brydon was to pay to the company as royalty *ten cents* for every ton of coal delivered under it. Now, we do not mean to say, the directors of a coal mining company may not, instead of working the mine themselves, lease it upon the payment of a royalty to the company on the coal mined, provided the lease is made in good faith, for the benefit of the company, and not to pro-

mote the interests of the lessee to the injury of the
stockholders. But in considering the question as to
the *bona fides* on the part of the majority of the direc-
tors in this case, we are not, it must be borne in mind,
dealing with a Board of Directors regularly elected,
and to whom the control and management of the
affairs of the company is entrusted. On the contrary,
from the organization of the North Branch Company in
1868 down to 1876, when it is said Brydon was author-
ized to make this contract, it does not appear there
ever had been a meeting of its Board of Directors.

The entire property belonging to the company, was
an old coal mine, all efforts to work which had proved
a failure; and its entire capital stock belonged to
Brydon and Gemmell. There was it seems nominally
at least, a Board of Directors, a majority of whom it
is said authorized Brydon to make this contract. But
who constituted this majority? First, we have Wil-
liam A. Brydon himself, then Edward R. Brydon his
brother—then John C. Brady his brother-in-law, then
Thomas E. Owens formerly a clerk in Brydon's store;
and Gemmell, who was a director and owner of nearly
one-half of the stock of the company, was not even con-
sulted or notified of the meeting at which a contract
of such vital importance to the company was to be
considered and acted upon. Now, if it be true that a
majority of the directors did, under such circum-
stances, authorize Brydon to make a contract in his
own name with the Railroad Company, for the supply
of 150 to 300 tons of coal daily at *one dollar and fifteen
cents per ton,* upon the payment by him of *ten cents per
ton* to the North Branch Company, it cannot be said
that what was done by the directors was done in good
faith for the benefit of the company. On the contrary,
it was a plain breach of trust on their part, and in
fraud of the rights of the stockholders. Nor can such

action on their part be supported on the ground that the company itself was without the means or credit necessary to carry out a contract for the delivery of coal to the Railroad Company. The proof is all against such a contention. Only a few days before the contract was made, we find Davis & Co. loaning the company $3000 on its own credit, and loaned too, for the express purpose of enabling the company to mine and deliver its coal to the railroad. Whatever may have been its credit when the mine was idle, and there was no demand for the six foot vein coal, now, that the Baltimore and Ohio Railroad Company was willing to contract for the daily supply of 150 tons at least for three years, there could be no difficulty whatever on the part of the company in making the necessary monetary arrangements to carry out such a contract. In fact, with the Davis loan of $3000 and the money in Brydon's hands for the 14,000 tons delivered before the contract, and the cost of the erection of the shutes borne by the Railroad Company, no further arrangements, it would seem, were necessary to enable it to mine and deliver the coal. And besides, if the company was without credit, Brydon was not certainly in any better condition. When Davis & Co. loaned the $3000 it was not on his credit, but the credit of the company, and they not only required that the entire sum should be expended in mine improvements, but, further, that the money should only be paid as the work progressed; and as additional security, Brydon himself says they required the payment of five cents on every ton of coal delivered under the contract. We see nothing in this record, from the beginning to the end, to justify us in saying that Brydon was in any better condition than the North Branch Company to make and carry out a contract with the Railroad Company. So, in any aspect in which this

contract is to be considered, it must in our opinion
be treated as a contract in behalf of the company, and
the judgment recovered thereon, as the property of the
company.

And this brings us to the question as to the right
of Gemmell and Sinclair, as stockholders, to file this
bill, about which so much was said in the argument.
Now, we quite agree that all actions in regard to the
rights and interests of a corporation, must, as a general
rule, be brought by the corporation itself.    This is a
matter for the corporate authorities themselves, and
not for the stockholders to determine; and to give the
latter a standing in Court, it must appear that the
directors have refused to institute proceedings in be-
half of the company, or that for certain reasons they are
not proper persons to be entrusted with prosecuting the
suit.    If, however, the directors, or officers of a corpo-
ration having the authority to direct its litigation,
are themselves guilty of the wrong complained of, a
Court of equity will interfere at the instance of the
stockholders, and this, too, without proof of a demand
and refusal on the part of the corporate authorities.
And for the reason that a demand upon them would,
under such circumstances be useless, and further that
it would be against the plainest principles of justice
to permit the perpetrators of the wrong to conduct a
litigation against themselves.    *Peabody vs. Flint, et al.,*
6 *Allen,* 52; *Brewer vs. Boston Theatre,* 104 *Mass.,* 378;
*Pond vs. Vermont Valley R. R. Co.,* 12 *Blatch. C. C.,*
280; *Salomons vs. Laing,* 12 *Beav.,* 377; *Currier vs.
New York R. R. Co.,* 35 *Hun,* 355; *Brinckerhoff vs. Bost-
wick, et al.,* 88 *N. Y.,* 52; *Doud, et al. vs. Wisconsin,
Pittsville and Superior R. R. Co.,* 65 *Wis.,* 108.

In this case the wrong complained of is alleged to
have been committed by the President of a company,
the directors of which are unknown, and the attempt

is made to justify the wrong on the ground that it was done with the approval and sanction of the directors. If this be so, they are not the proper persons to redress a wrong committed by themselves, and the appellees, as shareholders, have the right therefore to institute this suit in their own behalf, and in behalf of other shareholders.

We come now to the assignment of the judgment to Messrs. Henry G. Davis & Co., and in regard to this we also agree with the Judge below, that they are not to be treated as *bona fide* assignees without notice. They are owners of coal land adjoining the North Branch Mine, and they knew that this mine belonged to the North Branch Company, they knew, too, that for months before the contract was made, for the breach of which the judgment was recovered, the coal which had been delivered to the Railroad Company was coal taken from the North Branch Mine. Besides, only a few days before the contract was made they loaned to Brydon as President of the North Branch Company $3000, to be applied expressly for the purpose of enabling the company to mine and deliver coal to the Baltimore and Ohio Railroad, and they took a mortgage on the property of the North Branch Company to secure the payment of the loan. They knew, too, that Gemmell was or claimed to be a stockholder of that company. Brydon himself admits he told the Messrs. Davis & Co. about Gemmell's claim, and also about the contents of his letter of the 16th of March, 1875, in which he asserts in the most emphatic manner his unqualified ownership of its stock, and his purpose to defend his title to the same. And in addition to all this, when the case against the Railroad Company was tried in Howard County, Gemmell, in his testimony stated in the presence of Mr. Henry G. Davis, a member of the firm, that he was a stock-

holder of the North Branch Company. Now, if in the face of these facts, they saw fit to advance money to Brydon on the faith of his statements in regard to this contract, and in regard to Gemmell's rights as a stockholder, they did so with their eyes open, and took upon themselves the risk of Brydon's statements turning out to be true. They had, to say the least, sufficient information to put them upon inquiry.

As to acquiescence or tacit consent relied on as a bar to the right of the appellees to file this bill we have but a word to say, for it does not seem to us to have any application to this case. We have been unable to find any proof in the record even tending to show that the Messrs. Davis & Co. were in any manner misled to their prejudice by the acquiescence or conduct on the part of the appellees. They advanced money, it may be, to Brydon, but they did it on the faith of his own statements to them in regard to this contract and his ownership of the mine. They were not misled by the silence of Gemmell, because they had full notice that he claimed to be a stockholder of the North Branch Company, and they had, too, sufficient notice to put them on the inquiry that the contract although made in Brydon's name, was in fact a contract in behalf of that company. The money loaned and advanced to Brydon was advanced by them solely with the view of promoting their own interests. They had made a *private agreement* with him only a few weeks after his contract with the Baltimore and Ohio Railroad Company, by which they were to share with him the profits to be derived under this contract, and it was to their interest that this contract should be carried out. We can see no ground on which it can be said they were either misled or influenced in any manner by the conduct of the appellees. Nor do we see any ground on which Gemmell can be charged with delay or laches. He

Davis & Co., *et al. vs.* Gemmell and Sinclair.

knew it is true, that the contract was made in Brydon's name, but then Brydon told him that this was a mere matter of form, and that the contract was in fact a contract in behalf of the company. Brydon was the President of the company, and the contract being in his name, the suit was brought in his name, and when the case was tried in Howard County the jury failed to agree upon a verdict. No further steps were taken by him to bring the case to trial till 1885, eight years after the first trial, and the judgment, when recovered, was at once entered to the use of Henry G. Davis & Co. Whatever delay there was in prosecuting the suit to final judgment was the delay of Brydon, and not the delay of the appellees.

We do not deem it proper now to pass upon the question as to the payment of counsel fees. This is a matter to be considered upon final hearing when all the creditors shall have had the opportunity of coming in and of being heard. From what we have said it follows that the order of the Court below must be affirmed.

*Order affirmed, and*
*cause remanded.*

(Decided 26th March, 1889.)