766 A.2d 123

Norman **WERBOWSKY, et al.,**

v.

**Bertrand COLLOMB, et al.**

No. 53, Sept. Term, 2000.

Court of Appeals of Maryland.

Feb. 6, 2001.

582

584

Ronald B. Rubin (Rubin & Monahan, Chartered, on brief), Rockville; of counsel: Wechsler, Harwood, Halebian & Feffer, LLP, New York City, for appellants.

Richard J. Favretto (Mark W. Ryan, Gary A. Winters of Mayer, Brown & Platt, on brief), Washington, DC, for appellees.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

WILNER, Judge.

This is a stockholder's derivative suit. A minority stockholder in Lafarge Corporation sued the directors of the corporation, in the name of the corporation, alleging breach of fiduciary duty, waste, and gross negligence.[1] Those claims arose out of a transaction between Lafarge and its controlling stockholder, a French corporation named Lafarge S.A. (LSA), in which certain assets earlier purchased by LSA were sold to Lafarge for an amount that, in the plaintiffs' view, exceeded their worth by $190 million.

The issue before us is not whether the plaintiffs have a valid complaint but whether, due to their failure to make a demand for remedial action on the corporation prior to filing suit, they

---

1. The suit was initially filed by Harbor Finance Partners. During the course of the litigation, that entity dropped out of the case and was replaced by two other minority stockholders, Norman Werbowsky and Lenore Tom.

are able to proceed with their lawsuit. The Circuit Court for Montgomery County, in granting summary judgment for the defendants, concluded that such a demand, unless it would have been futile, is a prerequisite to filing a derivative action; that the demand would not have been futile in this case; and, for that reason, the failure on the part of the plaintiffs to make it could not be excused. The issue raises questions of both substantive corporate law and judicial procedure. In the end, we shall affirm.

## BACKGROUND

Most of the underlying facts in this case are not in substantial dispute, although the parties certainly disagree over some of the inferences that may properly be drawn from those facts. Lafarge is chartered in Maryland but headquartered in Virginia. It produces and sells concrete, cement, and gypsum wallboard, and engages in road building and other related activities. LSA is a French corporation that owns approximately 52% of the outstanding shares of Lafarge and is, therefore, its majority and controlling shareholder. The remainder of Lafarge's 70 million shares are publicly traded on the New York, Toronto, and Montreal Stock Exchanges.

In 1995, LSA began planning an acquisition of Redland PLC, a United Kingdom construction materials company with business assets and operations around the world, including substantial operations conducted through subsidiaries in the United States and Canada. In early 1996, LSA inquired of Lafarge's senior management whether Lafarge would be interested in any of Redland's American or Canadian assets, and the answer at the time was "no."

In October, 1997, LSA commenced a hostile takeover of Redland. Bertrand Collomb, who served as Chairman of the Board of Directors of both Lafarge and LSA and CEO of LSA, informed the Lafarge directors of LSA's offer and of its intention, in the event of a successful takeover, to propose to the Lafarge board the acquisition by Lafarge of some of Redland's American and Canadian assets. Although Red-

land's management initially resisted the bid, by December, LSA had acquired a majority of the shares, paying a premium for them. On December 11, 1997, Collomb reported to the Lafarge board the success of the takeover and of LSA's intent, in the near future, to formulate an offer to Lafarge regarding certain of Redland's North American assets and operations. He said that he had confirmed with Harold Kleinman, whose firm served as outside counsel to the Lafarge board, that it would be necessary to appoint a special committee of independent directors with authority to take all steps, including the appointment of a financial advisor, to consider the offer that LSA intended to make. In that regard, he called a special meeting of the board for December 16 to consider interim arrangements for the oversight of Redland's North American operations pending action on the proposed transaction.

Lafarge has 16 directors. The parties now agree, for purposes of this case, that six of those directors—Messrs. Collomb, Kasriel, Rose, Lefevre, Murdoch, and Piecuch—are "inside" or non-independent directors in that, at the relevant times, they also served as officers or directors of LSA. The parties also agree that three of the remaining directors— Messrs. Rodgers, Dauman, and MacAvoy—are "outside" independent directors who are not conflicted or controlled by LSA. They disagree about the status of the other seven directors—Ms. Malone and Messrs. McDonald, Cohen, Southern, Redfern, Buell, and Nadeau. The meeting called by Collomb was held by telephone. Fourteen of the directors— all but Dauman and Malone—participated. The minutes of that meeting show that Collomb iterated the intention of LSA to offer to Lafarge certain North American assets of Redland and his view that it would be in the best interest of the corporation for the board to appoint a special committee of independent directors to evaluate the offer and make a recommendation to the board with respect to it. After discussion, the board selected five of their members—Cohen, Malone, McDonald, Rodgers, and Southern—to serve as the special committee to evaluate and make a determination with respect to the anticipated LSA offer. The resolution authorized the

special committee to retain (1) independent legal counsel, (2) investment advisors to review and evaluate the acquisition proposal and, if the committee determined the acquisition was in the best interest of Lafarge, to provide an opinion as to whether the price is fair to the shareholders from a financial point of view, and (3) other independent advisors and consultants as it deemed appropriate.

The special committee met later that day. It elected McDonald as chair and appointed Kleinman to serve as counsel to the special committee. At its next meeting, on December 30, the special committee received presentations from two investment banking firms—Donaldson, Lufkin & Jenrette and SBC Warburg Dillon Read (Dillon Read)—and selected the latter as its investment banking advisor. On January 19, 1988, the committee met with the senior officers of Lafarge and with the team from Dillon Read. It was reported that, in addition to Dillon Read, a number of other consultants had been retained, including the accounting firms of Coopers & Lybrand and Arthur Andersen & Co. and the consulting firm of Trinity Associates. Lafarge's chief financial officer and senior vice president, Larry Waisanen, noted that approximately 100 people were involved in the due diligence effort. The Dillon Read team summarized the role their firm would play in performing confirmatory due diligence, analyzing the proposed transaction, and determining the fairness of any proposed transaction from a financial point of view. The offer from LSA was expected on January 23. The committee designated Waisanen as the principal negotiator of specific terms, to be supported by advisors from Dillon Read, Arthur Andersen, and Thompson & Knight. Eventually, three separate teams were created to evaluate the LSA proposal, from both the financial and operational aspects.

The price initially proposed by LSA for the Redland assets was $785 million. Between the receipt of the offer and mid-March, 1998, the evaluation teams reviewed the proposal and made reports to the special committee. In January and February, McDonald and Cohen, on behalf of the special committee, met in Zurich, Switzerland, with Collomb and

Kasriel, representing LSA, to discuss a number of issues, including price. At one point, according to Cohen, the committee members made clear that the price would have to be within the Dillon Read fairness range. Meanwhile, the special committee continued to meet on a regular basis to consider the progress being made with respect to the due diligence undertaking and various other aspects of the transaction. Minutes showed meetings on January 19 and 30, February 5 and 9, and March 6, 1998. On March 3, 1998, Dillon Read recommended to Waisanen that Lafarge acquire three properties of Redland—Western Mobile, Inc., which operated in Colorado, Redland Genstar, Inc., which operated in Maryland, and Redland Quarries, Inc., which operated in Ontario—and opined that (1) a price of $650 million was in line with financial valuation, excluding value for strategic opportunity, improvement of portfolio, future expansion of Lafarge's business, and additional synergies and improvements, and (2) realistically, to reach an agreement, the purchase price would have to be in the range of $670 to $695 million. On March 15, McDonald and Cohen had their final negotiating session with Collomb and Kasriel and agreed on a price of $690 million, net of debt, and on other contract terms that McDonald and Cohen regarded as favorable.[2]

That same day, March 15, the special committee met with MacAvoy and Redfern, who were regarded by the committee as independent directors, Waisanen, Kleinman, inside counsel for Lafarge, and representatives from Dillon Read. McDonald reported on the negotiations and the major terms. Copies of the proposed contract for the purchase of Redland's United States assets had been submitted to the members of the special committee, and McDonald noted that a similar agreement would shortly be prepared with respect to the Canadian assets. According to the minutes of the meeting, there fol-

---

**2.** McDonald stated in deposition testimony that the initial offer from LSA contained terms and conditions, other than price, that he regarded as "too grandiose," in that Lafarge would be picking up too many of Redland's liabilities, and that most of the discussion at the March 15 meeting concerned those other terms and conditions.

lowed an extensive discussion of various aspects of the agreement. The representative from Dillon Read stated that, on the basis of the information currently available, his firm would be able to deliver a fairness opinion with respect to the price and terms described by McDonald. After further discussion, the committee adopted a resolution approving the transaction and recommending it to the Lafarge board. The following day, the full board of Lafarge approved the recommendation of the special committee and the purchase of the three companies, in the form of the stock and asset purchase agreements previously submitted to the members, with the price not to exceed $690 million.

On March 18—one day after announcement of the transaction and without any communication with the company or its directors—this suit was filed, alleging, in a general way, that Lafarge had overpaid for the assets purchased from LSA and charging the directors with breach of their fiduciary duty and with the waste of corporate assets and gross negligence. The complaint alleged that any pre-suit demand *on the directors* would have been futile because (1) a majority of the board and a majority of the allegedly independent directors actively participated in the wrongful acts at issue and, by reason of the personal financial benefit they would realize through the proposed acquisition, they each had an irreconcilable conflict of interest regarding the prosecution of the action, (2) they could not defend their actions by any alleged independent business judgment since the wrongful acts alleged constitute a breach of their fiduciary duties and the waste of corporate assets, and (3) it was likely that, by reason of language in the corporation's directors' and officers' liability insurance policies, the corporation would be precluded from bringing an action against the directors. The complaint also alleged that any demand *upon the stockholders* to prosecute the action would be futile, one, because, with some 70 million shares outstanding, such a demand would be impractical, and, two, failure of a demand was excusable because LSA was the majority stockholder.

The defendants responded to the complaint with a motion to dismiss based on lack of jurisdiction over the foreign directors, who had no contact with Maryland, insufficiency of process, and failure to make demand on the directors for remedial action. With respect to the failure of demand defense, they averred that (1) a demand was not futile simply because the board contained some interested members and that, even if a majority of the board members were interested directors, the law allows the board to appoint a special litigation committee consisting of independent directors to consider the objective merits of the proposed lawsuit; (2) demand was not excused under Maryland law merely because a majority of independent directors approved the transaction; (3) the plaintiffs did not explain what personal benefit the directors received from the transaction other than payment for continued service on the Lafarge board and that alone did not establish the futility of a demand; and (4) demand was not excused because of any provisions in the corporate officers' and directors' liability insurance policies. The defendants also urged that the plaintiff was not excused from making a pre-suit demand on the stockholders, which they claimed was a prerequisite under Maryland law, either because LSA was a majority stockholder or because of practical difficulties.

The court granted the motion to dismiss, solely on the basis that the plaintiff had not sufficiently alleged corporate waste. That led to the amended complaint that is now before us. In that complaint, also charging breach of fiduciary duty, waste, and gross negligence, the plaintiffs averred in greater detail the nature of the control it contended LSA exercised over Lafarge and the transaction. It alleged that LSA controlled the Lafarge board and that, of the 16 Lafarge directors, 12 were conflicted by reason of either their employment or directorships with LSA or ongoing business relationships with Lafarge that could be terminated by LSA. It implied that Dillon Read was conflicted in that one Lafarge director—Mr. Buell—also served as a director of Swiss Bank Corporation, which is the parent of Dillon Read, and that, shortly after rendering its fairness opinion, Dillon Read was selected to co-

manage the underwriting of $650 million in Lafarge notes used to finance the purchase of the Redland assets, and that Arthur Andersen was also conflicted in that it provided accounting services to Lafarge. Three members of the special committee—Cohen, Malone, and Southern—it said, had an irreparable conflict of interest through their affiliation with companies that had significant business relationships with Lafarge. The plaintiff also complained that Collomb and Kasriel, who represented LSA in the negotiations, voted for the proposal as Lafarge directors, inferring, as a result, that the negotiations were not arms length.

With respect to the transaction itself, the amended complaint alleged that the true value of the Redland assets purchased by Lafarge from LSA was between $480 and $523 million, and that Lafarge therefore overpaid by between $165 and $210 million. Demand on the Lafarge board, it averred, was unnecessary in light of the allegations of waste and, in any event, would have been futile. Consistent with the initial complaint, the plaintiff asserted that any demand would have been futile because (1) a majority of the allegedly independent directors actively participated in the wrongful conduct, which was the direct and proximate result of their grossly negligent failure to inform themselves adequately as to the company's affairs and harmful effects of the proposed purchase; (2) the directors of Lafarge received substantial compensation as board members and, in light of LSA's domination and control of Lafarge, had an incentive to appease LSA in order to maintain their position on the board; and (3) in light of the corporate insurance policies, neither the directors nor the company could be expected to pursue the claims made by the plaintiff. Finally, as alleged in the initial complaint, the plaintiff contended that any demand on the stockholders to institute the action would be futile because of, one, the impracticality of contacting all of the stockholders, and, two, the control exercised by LSA.

The amended complaint also was met with a motion to dismiss, on the same three grounds, which was denied. With respect to demand futility, the court treated the motion as

presenting two more focused issues: (1) if a majority of the board are "interested directors," does the "business judgment" rule apply, and (2) when a majority stockholder is involved in the transaction, how may director interest be established? The court noted that the Maryland courts had not ruled directly on those issues and that both sides therefore relied heavily on Delaware law. It accepted that, for reasons of public policy, it was incumbent upon a shareholder to make a demand on the board of directors before bringing a derivative action and that, in the absence of such a demand, the plaintiff must allege facts that would demonstrate that such a demand would have been futile. Applying Delaware law, as enunciated in *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984), the court concluded that the test for determining demand futility requires a bifurcated analysis in which the facts alleged in the complaint are examined to determine whether they create a reasonable doubt that (1) the directors are disinterested and independent, and (2) the challenged transaction was the product of a valid exercise of business judgment. Under that test, if the court "is satisfied that the plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt as to either aspect of [that] analysis, the futility of demand is established and the court's inquiry ends."

Applying that Delaware test, the court concluded that, on the facts alleged in the amended complaint, there was a reasonable doubt as to whether at least 12 of Lafarge's 16 directors were independent, disinterested directors. The six that were also employees or directors of LSA had a direct interest in the transaction. Six of the remaining 10, it found, were directors or employees of other corporations "that have substantial business interests with Lafarge" and that, "[w]hile these interests are not with [LSA], they are nevertheless substantially influenced by or controlled by [LSA] by virtue of its controlling interest in Lafarge." A majority of the special committee, the court also found, consisted of directors having those business relationships with Lafarge. Those facts, along with others pled, the court concluded, were "sufficient to create a reasonable doubt about the disinterestedness of the

majority of the board approving the transaction, including the majority of the special committee" and that reasonable doubt was "sufficient to establish demand futility."

The court distinguished the various Maryland cases cited by the parties. In that regard, it concluded that, to the extent our holding in *Parish v. Milk Producers Assn.*, 250 Md. 24, 242 A.2d 512 (1968), could be read as a ruling that demand futility is established when the pleadings simply allege that a majority of the board participated in the wrongdoing, as the plaintiffs contended, such a reading was overbroad, as it would "make the prerequisite of a demand or pleading demand futility meaningless." The court also rejected the notion, drawn from *Edge Partners, L.P. v. Dockser*, 944 F.Supp. 438 (D.Md.1996), that a lack of insurance coverage for named directors can excuse a demand.

After an unsuccessful interlocutory appeal from that ruling by the defendants, discovery ensued, following which the defendants, through a motion for summary judgment, asked the court to revisit the demand issue. By that time, the status of the 10 Lafarge directors who were not actually serving as directors or officers of LSA had been documented with evidence and thus did not have to be resolved based solely on the allegations in the amended complaint. As noted, the plaintiffs did not challenge the independence of three of them—Rodgers, Dauman, and MacAvoy. None of the remaining seven had any direct connection with LSA. The facts posited as establishing a reasonable doubt as to their independence were as follows:

(1) Ms. Malone served on the boards of the Federal Reserve Bank of Richmond and several major corporations, including Dell Computer Corp., Hasbro, Inc., Houghton Mifflin Company, SAIC Corp., Union Pacific Resources Corporation, and Lowe's Companies. In 1997, Lowe's purchased approximately $2.1 million of gypsum wallboard from Lafarge, and in 1998, it purchased approximately $5.8 million of that product from Lafarge; there is no evidence that it did any business with LSA. Those purchases by Lowe's constituted

the close business connection alleged to have made her an interested, non-independent director. Ms. Malone's unrebutted affidavit stated that she had no involvement in those purchases and that, to the best of her knowledge, they were routine commercial transactions, at competitive rates, handled by employees of the two companies. She stated further that her compensation as a director of neither company was dependent on the level, profitability, or success of those routine purchases.

(2) Alonzo McDonald served as Chairman and CEO of Avenir Group, Inc., development bankers. There was no indication that Avenir did any business with either Lafarge or LSA. McDonald's independence was questioned because Robert Murdoch, who served as a director of both Lafarge and LSA, was listed as a "principal" in Avenir. The nature of that relationship, which was valued at about $300,000, is not entirely clear from the record before us. The Circuit Court determined that Murdoch had no ownership interest in Avenir but simply, on an independent basis, invested his own funds in companies that Avenir had also invested in. The plaintiffs have not challenged that finding.

(3) Marshall Cohen was a director of several corporations, including American Barrick Gold Corporation (Barrick) and American International Group, Inc. (AIG). In 1997, Lafarge sold $1,674,000 of fly ash and cement to Barrick. In an unrebutted affidavit, Cohen asserted that those transactions were routine commercial transactions, at competitive rates, handled by employees of the two companies, that they had never been discussed or voted on by the directors of either company, and that his compensation package from neither corporation has any relation to the level, profitability, or success of commercial transactions in the ordinary course of business between the two companies. A wholly-owned subsidiary of AIG, National Union Fire Insurance Company of Pittsburgh (National Union), provided insurance to Lafarge against employee theft. Cohen affirmed that he did not sit on National Union's board, that he had no responsibility for individual transactions by National Union, and that his com-

pensation package was not affected by the level, profitability, or success of ordinary-course-of-business commercial transactions between National Union and Lafarge.

(4) Ronald Southern served on the boards of several Canadian corporations, including Xerox Canada, Inc., Chrysler Canada Ltd., and Canadian Pacific Limited. He was also Chairman of the Board and CEO of ATCO Ltd., a publicly traded Canadian corporation. In 1996, ATCO sold just over $1 million of natural gas to Lafarge Canada, Inc.(LCI), a wholly-owned subsidiary of Lafarge. In an unrebutted affidavit, Mr. Southern averred that ATCO's rates for the sale of natural gas were totally regulated under Canadian law, that LCI was not a major customer of ATCO, and that, because the price was regulated, ATCO was indifferent as to whether it sold natural gas to LCI or any other particular customer. He added that he never had any responsibility for entering into transactions to sell natural gas to LCI or anyone else—that it was a routine commercial transaction, at fully regulated rates, handled by employees of the two companies. Canadian Pacific Limited, a Canadian railroad, sold $9.17 million of rail transportation service to Lafarge in 1997 and $7.38 million in 1998. Southern attested that those transactions were routine commercial transactions, at competitive rates, handled by employees of the two companies, that they had never come before the board of either company, that he had no responsibility for them, and that his compensation package was not affected by that business.

(5) John Redfern served as Chairman of the board of LCI and was also a director of Montreal Trust Company from the 1970's to 1997. He had retired from the trust company board before he voted on the Lafarge–LSA transaction. Over the years, Montreal Trust Company provided certain pension and trust services for Lafarge, including the mailing of proxy statements. The record does not indicate how much compensation it received for those services. In an unrebutted affidavit, Redfern asserted that he had no responsibility for the provision of those services, which were routine commercial transactions, that they were not discussed at board meetings,

and that his compensation package was unaffected by the business.

(6) Bertin Nadeau served as a director of Sun Life Assurance Company of Canada (Sun). In 1997 and 1998, Sun provided life insurance to employees of LCI. The amount of business was not disclosed in the record. In an unrebutted affidavit, Nadeau asserted that, as a director of Sun, he had no responsibility for individual insurance agreements, that the business between Sun and LCI was routine commercial business at competitive rates handled by employees of the two companies and was never discussed at board meetings, and that his compensation package was unaffected by that business.

(7) Thomas Buell was a director of several corporations, including B.C. Gas, Inc. and Placer Dome, Inc. In 1996, B.C. Gas sold $3.8 million of natural gas to LCI; in 1997 and 1998, the annual sales amounted to $1.4 million and $1.1 million, respectively. As with the case of ATCO, these sales were at regulated prices, and thus B.C. Gas was indifferent to whether it sold gas to LCI or any other particular customer. According to Buell's unrebutted affidavit, LCI was not a major customer of B.C. Gas, the business with LCI was routine commercial business at fully regulated rates, for which he had no responsibility, the transactions were not discussed at any board meeting, and his compensation package was unaffected by them. In 1997 and 1998, Placer Dome purchased $1.68 million and $2.16 million in fly ash, cement, and concrete from Lafarge. Buell asserted that these were routine commercial transactions at competitive rates that were handled by employees of the two companies, that he had no responsibility for them, that they were not discussed at any board meetings, and that his compensation package was unaffected by them.

On this evidence, and continuing to use the two-prong standard adopted by the Delaware court, the court concluded that the plaintiffs had failed to establish a reasonable doubt that a majority of the Lafarge board lacked independence. In effect, it concluded that 10 of the 16 directors were indepen-

dent. The court also concluded that there was no genuine dispute that Lafarge received substantial assets from LSA in return for the consideration paid and, quoting from *Grobow v. Perot,* 539 A.2d 180, 189 (Del.1988) (quoting *Saxe v. Brady,* 184 A.2d 602, 610 (Del.Ch.1962)), declared that the plaintiffs had failed to show that "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid." Upon those findings, the court held that demand was not excused and dismissed the action for failure to make a pre-suit demand on the Lafarge board. The court did not address the alternative defense of failure to make a demand on the stockholders of Lafarge; nor did it rule upon the personal jurisdiction and sufficiency of process defenses.

## DISCUSSION

Plaintiffs make, essentially, two complaints in this appeal. First, they assert that the question of whether a demand upon the directors for remedial action would have been futile is one that is to be addressed in a motion to dismiss, based upon the allegations in the complaint, and is not to be revisited as a factual matter on summary judgment. That question was properly, and finally, resolved, they urge, when the court denied the second motion to dismiss. Second, they contend that the burden is on the defendants to prove that the transaction was fair and that, on the record in this case, the defendants failed to meet that burden, especially in the context of summary judgment. Under either our holding in *Parish v. Milk Producers Assn., supra,* 250 Md. 24, 242 A.2d 512, or the standard adopted by the Delaware courts and applied here by the Circuit Court, they maintain that the court erred in concluding that a demand would not have been futile. We shall deal with both of those complaints, but in a somewhat reordered format.

### Derivative Actions

As a general rule, the business and affairs of a corporation are managed under the direction of its board of

directors. Except to the extent that a transaction or decision must, by law or by virtue of the corporate charter, be approved by the shareholders, the directors, either directly or through the officers they appoint, exercise the powers of the corporation. *See* Maryland Code, § 2–401 of the Corporations and Associations Article. Shareholders are not ordinarily permitted to interfere in the management of the company; they are the owners of the company but not its managers. Thus, any exercise of the corporate power to institute litigation and the control of any litigation to which the corporation becomes a party rests with the directors or, by delegation, the officers they appoint. As a check on this broad managerial authority, directors are required to perform their duties in good faith, in a manner they reasonably believe to be in the best interest of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. *Id.* § 2–405.1(a). That obligation runs, however, to the corporation and not, at least directly, to the shareholders.

 The shareholder's derivative action was developed in the mid 19th Century as an extraordinary equitable device to enable shareholders to enforce a corporate right that the corporation failed to assert on its own behalf. That right could include the recovery of losses occasioned by self-dealing or fraudulent or grossly negligent misconduct on the part of the corporate directors or officers. As Fletcher describes it:

"The nature of the derivative proceeding is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is [a] suit by the corporation, asserted by the shareholder on its behalf, against those liable to it. The corporation is the real party in interest and the shareholder is only a nominal plaintiff. The substantive claim belongs to the corporation.... The proceeding is typically brought by a minority shareholder, because a majority or controlling shareholder can usually persuade the corporation to sue in its own name."

13 William Meade Fletcher et al., Cyclopedia of the Law of Private Corporations § 5941.10 (1995 Rev. Vol); *see also Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984). The fact that the action is on behalf of the corporation, rather than the shareholder, has significant implications, not the least of which is the extent to which the corporation can control the litigation after it is filed.

### *The Demand/Futility Rule*

Both because a shareholder's derivative action necessarily intrudes upon the managerial prerogatives ordinarily vested in the directors and to curtail collusive activities by the corporation and mischief and abuse on the part of disgruntled shareholders, the law soon attached to this new mechanism the condition that, before being allowed to proceed with a derivative action, a shareholder first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed. In its initial formulation, this requirement was quite strict. See *Hawes v. Oakland*, 104 U.S. 450, 460–61, 26 L.Ed. 827, 832 (1881), in which the Court stated:

"[B]efore the shareholder is permitted in his own name, to institute and conduct a litigation which usually belongs to the corporation, he should show, to the satisfaction of the court, that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the court. If time permits, or has permitted, he must show, if he fails with the directors, that he has made an honest effort to obtain action by the stockholders as a body, in the matter of which he complains. And he must show a case, if this is not done, where it could not be done, or it was not reasonable to require it."

In Federal actions, the requirement of a demand, unless lawfully excused, remains fixed as both a substantive and

pleading prerequisite. Procedurally, Fed.R.Civ.P. 23.1 requires that a complaint in a derivative action "shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." In *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95–97, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152, 163–64 (1991), involving a Maryland corporation, the Court made clear that pre-suit demand was not merely a pleading requirement, but, through incorporation of State law, a substantive one:

> "To prevent abuse of this remedy, however, equity courts established as a 'precondition for the suit' that the shareholder demonstrate that 'the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.' *Ross v. Bernhard,* [396 U.S. 531, 534, 90 S.Ct. 733, 736, 24 L.Ed.2d 729, 734 (1970) ].

> \* \* \*

> The purpose of the demand requirement is to 'affor[d] the directors an opportunity to exercise their reasonable business judgment and "waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.'" [citation omitted] Ordinarily, it is only when demand is excused that the shareholder enjoys the right to initiate 'suit on behalf of his corporation in disregard of the directors' wishes.' [citation omitted] In our view, the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.' " [3]

*See also Levine v. Smith,* 591 A.2d 194, 207 (Del.1991).

Most, if not all, of the States have adopted some version of this requirement as part of their corporation law. *See* DEBO-

---

**3.** The essential point in *Kamen* was that, even for purposes of a derivative action under the Investment Company Act of 1940, which

RAH A. DEMOTT, SHAREHOLDER DERIVATIVE ACTIONS: LAW AND PRACTICE § 5.03 (1999). In *Parish v. Milk Producers Assn.*, *supra*, 250 Md. 24, 81–82, 242 A.2d 512, 544, we regarded it as well-established that courts would not ordinarily entertain a derivative suit by a shareholder on behalf of a corporation "until it appears that the intra-corporate remedies have been unsuccessfully pursued by the complaining stockholder," which means that, "generally speaking, the complaining stockholder must make demand upon the corporation itself to commence the action, and show that this demand has been refused or ignored." We added, however, that that general rule "is subject to a well-recognized exception, *i.e.*, that no such prior demand is required when it would be futile."

### *Evolution of the Futility Exception*

■ As noted, the concept of a shareholder's derivative action, to which was attached the demand requirement and the futility exception, was a common law development established and fashioned by the courts as a justifiable, but limited, intrusion upon the general authority of the directors to manage the business affairs of the corporation, and, for most of the century-and-a-half of its existence, it remained largely within the domain of the common law. In Maryland, it retains its common law status.[4] In much of the country, however, it is now governed by statutes, many of which have either repealed or significantly curtailed the futility exception. We have not visited the doctrine since *Parish* in 1968, and we therefore

---

invoked principles of Federal common law, the Federal courts were to apply the presumption of State law incorporation enunciated in *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) and look to the relevant State corporation law in determining the circumstances under which a demand may be excused as futile. The Court concluded that a Federal court that entertains a derivative action under the ICA "must apply the demand futility exception as it is defined by the law of the State of incorporation." *Id.* at 108–09, 111 S.Ct. at 1723, 114 L.Ed.2d at 172.

4. *Compare* §§ 4A–801 through 4A–804 and §§ 10–1001 through 10–1004 of the Corporations and Associations Article, dealing with derivative actions with respect to limited liability companies and limited partnerships.

need to take account of what has transpired in the meanwhile—both by statute and through the course of common law development in other States.

We first entertained the device of the derivative action in *Booth v. Robinson*, 55 Md. 419 (1881), where shareholders of a corporation sued the directors to recover for the loss in value of their stock by reason of what they asserted was willful and fraudulent mismanagement of the affairs of the corporation. We recognized that directors were not to be held accountable "for the consequences of unwise or indiscreet management, if their conduct is entirely due to mere default or mistakes of judgment," but that they would be liable upon clear proof of "fraud, combination, or gross negligence." *Id.* at 438. We observed that, in such cases, the proper party to complain was the corporation itself, because the duty owing by the directors is to the corporation and not directly to the shareholders, and thus held that "to enable a shareholder ... to maintain a bill against directors for such fraud or breaches of trust, he must allege *and show,* not only the violations of duty or breaches of trust on the part of the directors, but that he as stockholder has been damnified thereby, and that the corporation has failed or refused to take the proper legal steps for the redress of the wrong." *Id.* at 439 (emphasis added).

*Booth* came to this Court from a judgment entered on the merits after trial. The complaint was directed primarily against two of the six directors, who were charged with deliberately ruining the company in order to achieve personal objectives, emanating from their connection with competing interests, that conflicted with their duties to the corporation. In the course of our discussion of the requirement that the plaintiff show that the corporation had failed to take corrective action, we stated that "if the allegations of the bill *are sustained by proof* that a majority of the shares are owned by [the competing company] and that a majority of the directors are adverse to the interest of the plaintiffs, and are combined against them, *and would, by means of the control that they exercise, frustrate and defeat any attempt to induce the corporation to take action for the redress of the wrongs*

*alleged;* such facts would be a sufficient excuse for not making or alleging a formal demand upon the corporation to take action." *Id.* at 439 (emphasis added).

The Court elucidated further on the futility exception in *Davis v. Gemmell,* 70 Md. 356, 17 A. 259 (1889), where a shareholder sued to have a judgment that had been entered in the name of an assignee of the president of the corporation declared to be the property of the corporation. The company owned a coal mine and could have entered into a contract to supply coal to a railroad at $1.15/ton. Instead, the directors authorized the president of the company, individually, to enter into the contract and to pay the company 10 cents/ton for the coal taken. When the railroad breached the contract, the president recovered a judgment, which he assigned to a third party. The action by the directors, we held, constituted a plain breach of trust on their part and was in fraud of the rights of the stockholders. Noting that redress of such injury was normally for the corporation to pursue and that, to give stockholders a standing in court, "it must appear that the directors have refused to institute proceedings in behalf of the company, or that for certain reasons they are not proper persons to be entrusted with prosecuting the suit," we concluded:

> "If, however, the directors, or officers of a corporation having the authority to direct its litigation, are themselves guilty of the wrong complained of, a Court of equity will interfere at the instance of the stockholders, and this, too, without proof of a demand and refusal on the part of the corporate authorities. And for the reason that a demand upon them would, under such circumstances be useless, and further that it would be against the plainest principles of justice to permit the perpetrators of the wrong to conduct a litigation against themselves."

*Id.* at 376, 17 A. at 265.

We commented on the demand requirement in *Eisler v. Eastern States Corp.,* 182 Md. 329, 333, 35 A.2d 118, 119 (1943) and *Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946),

although neither case turned on that requirement. In *Eisler*, the shareholder sued the corporation, seeking the appointment of a receiver to institute action against the directors and officers. The corporation was solvent, most of the transactions complained of occurred before the plaintiff became a shareholder, and there was no indication that any other shareholders were dissatisfied with the current management. We affirmed the denial of relief but observed that, with respect to transactions that occurred after the plaintiff became a shareholder, he was entitled to seek redress in a derivative action "after having requested that company's officers to take action, and having been refused." *Eisler*, 182 Md. at 336, 35 A.2d at 121 (quoting *Williams v. Messick*, 177 Md. 605, 609, 11 A.2d 472, 474). *Waller* was a direct action by a shareholder against corporate officers and directors. We affirmed the dismissal of the action, holding that the action should have been brought as a derivative one. In that regard, we observed that "if the courts would open their doors to all complaining stockholders without requiring them to show that it was impossible to obtain redress through regular corporate action, litigation of this kind would be endless." *Waller*, at 192, 49 A.2d at 453. Thus, we continued, "before a stockholder will be permitted to maintain a suit for injury to the corporation, he must allege *and prove* he requested the directors to institute suit in the name of the corporation, and they refused." *Id.* (emphasis added).

In *McQuillen v. National Cash Register Co.*, 22 F.Supp. 867 (D.Md.1938), *aff'd*, 112 F.2d 877 (4th Cir.1940), *cert. denied*, 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450 (1940), the U.S. District Court considered the futility issue, which was one of several grounds raised in a motion to dismiss a shareholder's derivative action. The plaintiffs offered as an excuse for failing to make demand on the directors or shareholders for remedial action that the company was "dominated and controlled" by the individual defendants and that, if they were permitted to conduct the suit, it would be prosecuted by them for the company against themselves. The District Court agreed that, on that allegation, "an appeal to the directors

would be futile, since it is apparent on the face of the pleadings that their interests are antagonistic to those of the plaintiffs." *McQuillen,* 22 F.Supp. at 874.

Although *McQuillen* was decided under principles of Federal, rather than Maryland, law,[5] Judge Coleman's pronouncement in that case was treated by us as authoritative in *Parish. Parish* involved a derivative action by several members of an incorporated cooperative association against the association and a number of individual officers and directors, complaining of fraud, mismanagement, and self-dealing on the part of the officers and directors. The case reached us from the sustaining of demurrers upon a finding that the complaint failed to state a cause of action.

The principal question that dominated the 82 page opinion in that case was whether the substantive allegations were sufficient, but one sub-issue was whether the complaint alleged sufficient grounds to excuse the plaintiffs' failure to seek remedial action from the directors before filing suit. Noting that the complaint alleged acts of fraud, concealment, illegality, gross negligence, waste of corporate assets, and conspiracy to conceal losses on the part of the directors and averred as well that a majority of the current board participated in some of those acts, we concluded that "it would be futile for the plaintiffs to make demand upon those directors to cause the Association to sue them to recover for their own wrongful injuries to the Association." *Parish,* 250 Md. at 83, 242 A.2d at 545. Our determination of futility seems to have been based on two somewhat different precepts: (1) it was not likely that the culpable directors would, in fact, agree to permit the company to sue them; and (2) even if they would so agree, because of their conflicted status, a court should not permit them to do so. The first of these is a pragmatic futility; the second is more policy-oriented. We noted that, in

---

**5.** *McQuillen* was decided by the District Court one month before the Supreme Court filed its opinion in *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). No Maryland cases were cited for the court's holding on futility.

considering the entire question, "it should be kept in mind that the trend in the more modern authorities is to be more tolerant of the derivative suits of minority members or stockholders" in that "[t]he size and complexity of corporate transactions makes necessary and important this form of 'legal therapeutics.'" *Id.* at 86, 242 A.2d at 546.[6]

Whatever may have been the perceived trend in 1968, when *Parish* was decided, the trend since then has been to enforce more strictly the requirement of pre-suit demand and at least to circumscribe, if not effectively eliminate, the futility exception. As noted, most, if not all, of the States had adopted at least a generalized prerequisite of a pre-suit demand and most had recognized as well a futility exception to that requirement. Until *Kamen, supra,* 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152, some of the Federal courts had fashioned a Federal common law that embodied both the requirement and the exception. The problem was that, though generally accepting the principle "that some level of directorial involvement in a challenged transaction excuses demand," the courts had "frequently disagreed over how to apply this principle" and jurisdictions "differ significantly in the circumstances deemed sufficient to excuse demand." 2 AMERICAN LAW INSTI-TUTE, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.03 cmt. d (1994); *see also* DEMOTT, *supra,* § 5.07. Professor Swanson has noted that the futility determination "sometimes turns on whether all directors are named as defendants, whether the alleged wrongdoers constitute a majority of the board, or whether a demand would likely prod the directors into corrective action," and that "[e]ven among these general approaches, each state jurisdiction tends to have a slightly different formula." Carol B. Swanson, *Juggling Shareholder Rights and Strike Suits in Derivative Litigation: The ALI Drops the Ball,* 77 Minn. L.Rev. 1339, 1351–52 (1993).

---

**6.** It is curious that, although we quoted the brief passage from *Eisler* and a longer passage from *McQuillen,* we neglected even to mention *Waller v. Waller* in our discussion of the futility exception.

The disarray in implementation may well have been the product of differing responses to competing basic viewpoints about derivative lawsuits, played out in a wide variety of contexts—complaints against directors, against corporate officers or employees, against majority shareholders, against third parties, complaints based on nonfeasance, as opposed to misfeasance or malfeasance, complaints alleging mismanagement or waste, complaints alleging fraud or self-dealing, situations where the directors simply approved a challenged decision or transaction and situations where they participated more actively in the allegedly wrongful conduct, situations where the directors had a direct personal interest in the transaction or decision and situations where their personal interest was more remote. As noted by Swanson, *supra*, 77 Minn.L.Rev. at 1340–41, one perspective "embraces derivative suits as an invaluable procedural vehicle permitting shareholders to champion their corporation's rights when corporate management refuses to do so," while another "cautions that corporations, not the courts, should resolve internal conflicts, and that derivative litigation necessarily raises the specter of shareholder strike suits and undue judicial interference with the business judgments of management."

Beginning in the 1980's, some courts and other interested groups began to search for and develop a more objective and articulable balance between the competing viewpoints. In *Aronson v. Lewis*, 473 A.2d 805 (Del.1984), the Delaware Supreme Court fashioned the two-prong test that was applied by the Circuit Court in this case. The Delaware court began by recognizing that the demand requirement was "a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Id.* at 812. The court viewed the question of demand futility as "inextricably bound to issues of business judgment and the standards of that doctrine's applicability." *Id.* The business judgment rule, in turn, was both an acknowledgment of the managerial prerogatives of directors and "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the

action taken was in the best interests of the company." *Id.*[7] Absent an abuse of discretion, that judgment will be respected by the courts.

The function of the business judgment rule, the court continued, was "of paramount significance" in the context of a derivative action, coming into play "in addressing a demand, in the determination of demand futility, in efforts by independent disinterested directors to dismiss the action as inimical to the corporation's best interests, and generally, as a defense to the merits of the suit." *Id.* Its protection, however, can be claimed only by "disinterested directors whose conduct otherwise meets the tests of business judgment." *Id.* From the standpoint of interest, "this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* Accordingly, if that kind of director interest is present and the transaction is not approved by a majority consisting of disinterested directors, the business judgment rule has no application.

Apart from an absence of that kind of conflict, the court noted that, to avail themselves of the business judgment rule, directors have a duty to inform themselves of all material information reasonably available to them and to act with requisite care in the discharge of their duties. The test for director liability in Delaware is predicated on concepts of gross negligence.

Turning then to the demand futility issue, the court observed that the rule emanating from earlier cases was that "where officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation," but concluded that those cases "cannot be taken to mean that any board approval of a challenged transaction automatically con-

---

**7.** *See* Maryland Code (1999), Corps. & Ass'ns art., § 2–405.1(e), establishing the same presumption for directors of Maryland corporations.

notes 'hostile interest' and 'guilty participation' by directors, or some other form of sterilizing influence upon them." *Id.* at 814. Were that so, the court stated, "the demand requirements of our law would be meaningless." *Id.* The balance struck by the court, in determining whether a pre-suit demand would have been futile, was for the trial court to decide, under the particularized facts alleged, whether "a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* Only if the particularized facts "support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment" is a demand excused. *Id.* at 815.

As applied by the Delaware courts, that formulation is an exacting requirement. In *Aronson,* the court made clear that the "shorthand shibboleth of 'dominated and controlled directors' is insufficient," and that "it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate decision," for "[t]hat is the usual way a person becomes a corporate director." *Id.* at 816. Nor is "mere directorial approval of a transaction, absent particularized facts supporting a breach of fiduciary duty claim, or otherwise establishing the lack of independence or disinterestedness of a majority of the directors" sufficient to excuse demand. *Id.* at 817. Later cases have made clear that interest or dependence may not be found merely from the fact that directors are paid for their services or on speculative, non-specific allegations that they acted in order to secure their retention as directors. *Grobow v. Perot,* *supra,* 539 A.2d 180. With respect to allegations of corporate waste, the test, both as to ultimate liability and with respect to demand futility, is whether what the corporation has received "is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid." *Id.* at 189 (quoting *Saxe v. Brady,* 184 A.2d 602, 610 (Del.Ch.1962)). *See also Levine v. Smith, supra,* 591 A.2d 194.

Both before and after the formulation of the Delaware test, the Section of Business Law of the American Bar Association (ABA) and the American Law Institute (ALI) were working on statutory models to deal with the demand futility problem. In 1950, the ABA section drafted the first Model Business Corporation Act, which had no provision dealing with derivative actions. In 1960, a new version of the Model Act contained an optional provision on derivative suits, but it said nothing about a demand requirement. The first insertion of a demand requirement came in 1981, upon the recommendation of the section's Committee on Corporate Laws, and was essentially a pleading requirement comparable to Fed.R.Civ.P. 23.1, requiring that a derivative action complaint allege "with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors and the reasons for his failure to obtain the action or for not making the effort." *See Report: Proposed Revisions of the Model Business Corporation Act Affecting Actions by Shareholders,* 37 Bus. Lawyer 261, 262 (1981). There was no discussion in the recommendation as to the standards to be applied in excusing the failure of a demand, only that "plaintiff should be excused from the demand when he pleads facts which show that the effort would be useless." *Id.* at 264.

In 1989, the ABA Section of Business Law came to a dramatically different conclusion and, upon the recommendation of its Committee on Corporate Laws, proposed a flat "universal" demand requirement. *See Changes in the Model Business Corporation Act—Amendments Pertaining to Derivative Proceedings,* 44 Bus. Lawyer 543 (1989). New § 7.42 of the Model Business Corporation Act now provides:

"No shareholder may commence a derivative proceeding until:

(1) a written demand has been made upon the corporation to take suitable action; and

(2) 90 days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless

irreparable injury to the corporation would result by waiting for the expiration of the 90–day period."

The Official Comment to § 7.42, taken verbatim from the recommendation of the Committee on Corporate Laws, explains:

"This approach has been adopted for two reasons. First, even though no director may be independent, the demand will give the board of directors the opportunity to re-examine the act complained of in the light of a potential lawsuit and take corrective action. Secondly, the provision eliminates the time and expense of the litigants and the court involved in litigating the question whether demand is required. It is believed that requiring a demand in all cases does not impose an onerous burden since a relatively short waiting period of 90 days is provided and this period may be shortened if irreparable injury to the corporation would result by waiting for the expiration of the 90–day period. Moreover, the cases in which demand is excused are relatively rare. Many plaintiffs' counsel as a matter of practice make a demand in all cases rather than litigate the issue whether demand is excused."

In 1978, the ALI, building on earlier initiatives, began work on its Project on the Structure and Governance of Corporations. In 1992, it approved and published its comprehensive *Principles of Corporate Governance: Analysis and Recommendations*, Part VII, Chapter 1 of which dealt with derivative actions. With respect to the demand requirement, the ALI adopted a position very close to that of the ABA Section on Business Law. Section 7.03 of the *Principles*, captioned "Exhaustion of Intracorporate Remedies: The Demand Rule," provides:

"(a) Before commencing a derivative action, a holder or a director should be required to make a written demand upon the board of directors of the corporation, requesting it to prosecute the action or take suitable corrective measures, unless demand is excused under § 7.03(b). The demand should give notice to the board, with reasonable specificity,

of the essential facts relied upon to support each of the claims made therein.

(b) Demand on the board should be excused only if the plaintiff makes a specific showing that irreparable injury to the corporation would otherwise result, and in such instances demand should be made promptly after commencement of the action.

(c) Demand on shareholders should not be required.

(d) Except as provided in § 7.03(b), the court should dismiss a derivative action that is commenced prior to the response of the board or a committee thereof to the demand required by § 7.03(a), unless the board or committee fails to respond within a reasonable time."

The ALI gave a number of reasons for its recommendation. It first stated the several recognized objectives of the demand requirement, each of which it regarded as legitimate. It noted as well that courts had traditionally accepted the principle that "some level of directorial involvement in a challenged transaction excuses demand" but that they "differ significantly" in the circumstances deemed sufficient to excuse demand. The Institute found, however, that all of the formulations were "somewhat inexact and reflect a largely outmoded view of the function of the demand rule." *See* cmt. d to § 7.03.

The ALI took note of the Delaware two-prong test but concluded that, by applying a reasonable doubt standard, it "seems to inject a substantial measure of subjective judicial discretion into the decision whether to excuse demand" and noted that a number of Federal cases applying Delaware law had found a reasonable doubt about the board's performance that might not have sufficed in Delaware. *Id.; see also Starrels v. First Natl. Bank of Chicago*, 870 F.2d 1168, 1175 (7th Cir.1989) (Easterbrook, J., concurring) (questioning applicability of criminal standard of proof in corporate context); and John Coffee, *New Myths and Old Realities: The American Law Institute Faces the Derivative Action*, 48 Bus. Lawyer 1407, 1412–13 (1993) (second prong of standard "is susceptible to highly variant interpretation and application"). The

"universal demand" proposal, it said, "eliminates much of the threshold litigation, collateral to the merits of the action, that today slows the pace and increases the cost of derivative actions," in that, under § 7.03(b), "courts would not need to resolve the often complex, but ultimately peripheral, issue whether demand was necessary before reaching the central issue of the board's or committee's justifications for dismissal of the action...." *Principles of Corporate Governance, supra,* at § 7.03 cmt. e. It observed, as well, that, "because making demand on the board is a relatively costless step, imposing this requirement places little burden on the plaintiff" and that, conversely, demand may sometimes induce the board to take corrective action that moots or permits an early resolution of the action. *Id.*

Finally, the ALI suggested that a universal demand rule better enabled the corporation to respond in those circumstances in which a demand might be excused because the directors were interested and therefore disqualified. In that regard, it noted:

> "Although requiring demand when a majority of the board is clearly interested in the challenged transaction has struck some courts as an exercise in futility, this view misconceives the range of options still open to the board. Even in such a case, the board as a whole can appoint the minority of the board that is disinterested, or some of them ... to a special committee, which can consider the demand, or, once litigation has commenced, can move ... to dismiss the action or ... can seek to settle it."

*Id.*

These recommendations from the ABA and the ALI have had a considerable impact. At least 17 States have, by statute, adopted § 7.42 of the Model Business Corporation Act[8] and one more, Florida, established a universal demand

---

8. *See* Ariz.Rev.Stat.Ann. § 10–742; Conn.Bus.Corp.Act § 33–722; Ga. Code Ann. § 14–2–742; Haw.Rev.Stat. § 414–173; Idaho Code § 30–1–742; Me.Rev.Stat.Ann. tit. 13A § 630; Mich.Comp.Laws Ann. § 450.1493a; Miss.Code Ann. § 79–4–7.42; Mont.Code Ann. § 35–1–

requirement in different language.[9] The Pennsylvania Supreme Court adopted a number of sections of the *Principles,* including § 7.03, by judicial decision, concluding that they provided necessary guidance and were consistent with Pennsylvania precedent. *See Cuker v. Mikalauskas,* 547 Pa. 600, 692 A.2d 1042 (1997); *Drain v. Covenant Life Ins. Co.,* 551 Pa. 570, 712 A.2d 273 (1998). In *Boland v. Engle,* 113 F.3d 706 (7th Cir.1997), the Court of Appeals for the Seventh Circuit, applying Indiana law, predicted that the Indiana Supreme Court would modify its dated common law and follow § 7.03 of the *Principles,* although, in light of its finding that the plaintiff's failure to make demand could not be excused under existing Indiana law, the court did not need to rest its decision on that prediction. Noting the adoption of the ABA/ALI recommendation eliminating the futility exception by 11 States at the time, the Federal court rejected the suggestion that Indiana would follow the Delaware approach and concluded, "[r]ather, we surmise that the highest court in Indiana would today be persuaded by the general trend in the law towards narrowing, if not eliminating, the exceptions from the demand requirement." *Id.* at 712.[10] In 1996, the New York Court of Appeals looked with some apparent favor on § 7.42 of the Model Business Corporation Act and § 7.03 of the *Principles,* but, in light of the facts that (1) those provisions were inconsistent with an existing New York statute, and (2) bills to codify a "universal demand" had been thrice rejected by the New York legislature, the court declined to do what the Pennsylvania court did. *See Marx v. Akers, supra,* 88 N.Y.2d 189, 644 N.Y.S.2d 121, 666 N.E.2d 1034.

543; Neb.Rev.Stat. § 21–2072; N.H.Rev.Stat.Ann. § 293 A:7.42; N.C.Gen.Stat. § 55–7–42; Tex.Bus.Corp.Act Ann. art. 5.14(C); Utah Code Ann. § 16–10a–740(3); Va.Code § 13.1–672.1(B); Wis.Stat.Ann. § 180.0742; Wyo.Stat. § 17–16–742.

**9.** *See* Fla.Stat.Ann. § 607.07401(2), requiring that a derivative action complaint allege with particularity "the demand made to obtain action by the board of directors and that the demand was refused or ignored."

**10.** *See Barth v. Barth,* 659 N.E.2d 559, 562–63 (Ind.1995), in which the Indiana court adopted § 7.01(d) of the ALI Principles.

### The Maryland Response

In *Kamen v. Kemper Fin. Servs., Inc.,* 939 F.2d 458 (7th Cir.1991), the Court of Appeals for the Seventh Circuit, on remand from the Supreme Court (*see Kamen v. Kemper Fin. Servs., Inc., supra,* 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152), attempted to predict how Maryland would react to these developments. Citing *Waller, Eisler,* and *Parish,* the court noted that Maryland requires demand as a norm but excuses it when the request would be futile, but that it had "done little to develop the scope of its futility exception." *Id.* at 460. The plaintiff posited six reasons why a pre-suit demand on the directors would have been futile, including (1) the seven independent directors on the 10 person board received aggregate remuneration of $300,000/year for their services as directors, (2) the directors voted to circulate the proxy statement complained of, (3) they opposed her lawsuit on both procedural and substantive grounds, (4) a demand would have been tantamount to a request that the directors sue themselves, and (5) the directors were under the control of Kemper.

The court did not read *Parish* as excusing demand on any of those grounds. If remuneration or a general allegation of control were sufficient, the court noted, "the demand rule would be negated—for almost all directors receive fees, and independent directors come to a board after being slated by corporate insiders." *Id.* In the particular case, the plaintiff was not seeking damages against the directors personally, so the third reason offered had no relevance. In dealing with the assertions that all of the directors approved the proxy statement and opposed her lawsuit, the court noted that whether the directors' involvement in the transaction complained of excuses a demand depends on the function of the demand rule. If demand serves only to alert the directors to a grievance, then their involvement *would* excuse a demand, "because they already know what they have done." *Id.* at 461. If, however, demand "either recognizes the allocation of powers within the corporation ... or serves a screening role (a form of alternative dispute resolution helping to weed out weak cases), then

the fact that the directors participated in the transaction is not enough." *Id.* Maryland, the court held, had "not spoken clearly to the function demand serves," although *"Waller* treats demand as a useful screen for the courts, and *Parish* says that application must be made unless the directors are 'wrongdoers.' " *Id.* Participants who are not wrongdoers, the court continued, "may evaluate their acts and change their minds." *Id.*

Although noting cases that appeared to support Kamen's approach, the Seventh Circuit court observed that "[t]he tide is running against this approach." *Id.* Citing the ALI *Principles* and the Delaware view, the court determined that "[t]he prevailing contemporary view is that demand is necessary if the directors are disinterested-and because of the business judgment rule directors may be financially disinterested even if they took part in the acts of which the plaintiff complains." *Id.* The court concluded:

> "In resolving doubt about the scope of its demand requirement, Maryland could well be influenced by the recommendations of the American Law Institute and the American Bar Association, both of which believe that the futility exception to the demand requirement should be eliminated rather than expanded [citations omitted]. So, too, Maryland might be influenced by the burgeoning research casting doubt on the value of derivative litigation for investors [extensive citations omitted]. State legislatures have begun to adopt universal—demand requirements. There is no counter movement toward enlarging the futility exception. We think it likely, then, that if Maryland does not abolish the futility exception it will cast its lot with the states that require demand on directors who face no substantial risk of personal liability."

*Id.* at 461–62. *See also Grill v. Hoblitzell,* 771 F.Supp. 709 (D.Md.1991).

There is much to be said for the ABA/ALI approach, but, unlike the Pennsylvania court, we are not prepared, at this point, to engraft it as part of our common law. It is not just

§ 7.42 (or § 7 .03 of the *Principles* ) that is involved. That section is part of a larger scheme laid out in other sections of the Model Code and *Principles,* and careful attention needs to be given to the provisions in those sections as well. *See* MBCA § 7.41 (standing requirements), § 7.43 (stay of proceedings pending corporate inquiry), § 7.44 (circumstances under which court may dismiss action on motion of corporation), § 7.45 (discontinuance or settlement), § 7.46 (payment of expenses), and § 7.47 (applicability to foreign corporations), and *Principles* §§ 7.01 through 7.17. The approach taken by the ABA and ALI constitutes a radical departure from our current common law, and, although it is certainly within our power to make such modifications, this is a matter that should be subjected to legislative hearings, at which all interested groups, and not just the litigants in one case, can present their views. We therefore decline, at this point, to adopt the ABA/ALI approach of eliminating altogether the futility exception.

Nor are we disposed, at this point, to adopt in full the Delaware approach. Although, due to the respect properly accorded Delaware decisions on corporate law, the Delaware approach is often mentioned and the business judgment rule is generally regarded as applicable in a demand futility analysis, few, if any, States have abandoned their existing law in favor of that approach, and some of the criticism of it needs to be taken into account.

We agree with much of what the Seventh Circuit court said in *Kamen,* however, and are not willing to excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action. The demand requirement *is* important. Directors are presumed to act properly and in the best

interest of the corporation. They enjoy the benefit and protection of the business judgment rule, and their control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing. Nor should they, or the corporation, be put unnecessarily at risk by minority shareholders bent simply on mischief, who file derivative actions not to correct abuse as much to coerce nuisance settlements.[11]

We agree, moreover, with the ABA/ALI that, in most cases, a pre-suit demand on the directors is not an onerous requirement. As the Seventh Circuit court noted, it gives the directors—even interested, non-independent directors—an opportunity to consider, or reconsider, the issue in dispute. It may be their first knowledge that a decision or transaction they made or approved is being questioned, and they may choose to seek the advice of a special litigation committee of independent directors, which has become a common practice,[12] or they may decide, as a business matter, to accede to the demand rather than risk embarrassing litigation. The futility exception essentially eliminates any chance at meaningful pre-litigation alternative dispute resolution. It also virtually assures extensive and expensive judicial wrangling over a peripheral issue that may result in preliminary determinations regarding director culpability that, after trial on the merits, turn out to be unsupportable. If a demand is made and refused, that decision, and the basis for it, can be reviewed by a court under the business judgment rule standard.

**11.** We do not, in any way, impinge the motives of the plaintiffs in this case. Evidence was presented, however, that the entity that initially filed this action, based on its ownership of 20 shares of Lafarge stock, had filed 64 shareholder lawsuits against various corporations since 1994, many within a day or two after announcement of the transaction being challenged.

**12.** *See Burks v. Lasker, supra,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Rosengarten v. Buckley,* 613 F.Supp. 1493 (D.Md.1985); DeMott, *supra,* § 5.14; Swanson, *supra,* 77 Minn.L.Rev. at 1356–59; James J. Hanks, jr., Maryland Corporation Law § 7.21[c] at 272–75 (1999 Supp.).

██ We adhere, for the time being, to the futility exception, but, consistent with what appears to be the prevailing philosophy throughout the country, regard it as a very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule. That focuses the court's attention on the real, limited, issue—the futility of a pre-suit demand—and avoids injecting into a preliminary proceeding issues that go more to the merits of the complaint—whether there was, in fact, self-dealing, corporate waste, or a lack of business judgment with respect to the decision or transaction under attack. It does not preclude, however, appropriate judicial review, under the business judgment rule, of the response (or non-response) to a demand. *See Harhen v. Brown,* 431 Mass. 838, 730 N.E.2d 859 (2000).

### *This Case*

As noted earlier, the plaintiffs make two basic complaints about the judgment entered by the Circuit Court—that it was error for the court to decide the futility issue on summary judgment after concluding that the amended complaint sufficiently alleged futility, and that, on the standard applicable to a summary judgment motion, the evidence sufficed to demonstrate futility. We find no merit in either complaint.

██ Although the issue of demand futility is often raised and decided in the context of a motion to dismiss, based on the allegations of the complaint (*see Parish, supra,* 250 Md. 24, 242 A.2d 512), there is no requirement that the issue be resolved in that context. *See Booth v. Robinson, supra,* 55 Md. 419; *Davis v. Gemmell, supra,* 70 Md. 356, 17 A. 259. Obviously, if the complaint fails to allege sufficient facts which, if true, would demonstrate the futility of a demand, it is entirely appropriate to terminate the action on a motion to

dismiss. But the issue is not foreclosed simply because the complaint is sufficient. Plaintiffs can allege most anything, and, if the court were bound to consider only the allegations of the complaint, the futility exception would swallow in one gulp the demand requirement. The futility issue may be resolved as a factual matter. *See Good v. Getty Oil Co.,* 518 A.2d 973, 974 (Del.Ch.1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 834 F.Supp. 1171 (E.D.Mo.1993), *aff'd sub nom. UniGroup, Inc. v. Winokur,* 45 F.3d 1208 (8th Cir.1995). As we stated, quite directly, in *Waller, supra,* 187 Md. at 192, 49 A.2d at 453, before commencing a derivative action, a shareholder must "allege and *prove*" that he, she, or it requested the directors to sue in the name of the corporation. (Emphasis added.)

Demand futility is, however, a preliminary issue that is discrete, that does not go to the merits of the underlying complaint, that needs to be resolved before the court undertakes to consider the merits, and, as the plaintiffs conceded, that is resolvable by the court, not a jury. If it survives a motion to dismiss, it is a perfect candidate for resolution pursuant to Maryland Rule 2–502.[13] Under that rule, the court may isolate the futility issue, take evidence on it, and make ultimate findings of fact with respect to it. Although we see no reason why the court cannot, upon a proper motion, enter a summary judgment on that issue, it would ordinarily be better, and much more efficient, for the court to utilize the rule and make the ultimate findings of fact which, if supported by the evidence, are then essentially final

---

13. Rule 2–502 provides: "If at any stage of an action a question arises that is within the sole province of the court to decide, whether or not the action is triable by a jury, and if it would be convenient to have the question decided before proceeding further, the court, on motion or on its own initiative, may order that the question be presented for decision in the manner the court deems expedient. In resolving the question, the court may accept facts stipulated by the parties, may find facts after receiving evidence, and may draw inferences from these facts. The proceedings and decisions of the court shall be on the record, and the decisions shall be reviewable upon appeal after entry of an appealable order or judgment."

and unimpeachable, rather than use summary judgment, which requires the court to view the facts and the inferences from them in the light most favorable to the party opposing the motion.

Here, the court used a summary judgment procedure but, on this record, did not err in doing so. As we have indicated, the issue, as presented to the trial court, really came down to the seven directors whose status was contested. The plaintiffs urge that all of them are conflicted because of the fees they make as Lafarge directors and their presumed desire to retain their directorships, which, according to the plaintiffs, is dependent on their maintaining good relations with LSA and its senior management, that six of them are conflicted because of the business that other companies of which they are directors do with Lafarge, and that McDonald was conflicted because of his company's relationship with Murdoch, an LSA director. We have recounted the relevant facts regarding each of those directors and conclude that, even viewing the evidence in a light most favorable to the plaintiffs, those directors were not conflicted or controlled by LSA to the point that a demand upon them would have been futile. There was no evidence presented that their service as Lafarge directors would have caused them to reject a demand for any reason not within the ambit of the business judgment rule. Nor was there evidence that any routine business between other companies on whose boards they served and Lafarge or a Lafarge subsidiary interfered with their ability to act independently. There was smoke and speculation, but no evidence. Even on the theories argued to the Circuit Court, much less the standard adopted in this Opinion, summary judgment was properly granted.

JUDGMENT AFFIRMED, WITH COSTS.