LOUIS L. STANTON, District Judge:
The named defendants and nominal defendant move to dismiss the plaintiffs' verified consolidated stockholder derivative complaint for violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment (Dkt. No. 105) on the ground that the plaintiffs lack standing to assert claims derivatively[1] on behalf of Resource Capital.
For the following reasons, the motion is granted.
THE PARTIES
The plaintiffs are Joseph Greenberg and James M. DeCaro, alleged shareholders of Resource Capital who seek to litigate corporate claims derivatively on behalf of Resource Capital.
The nominal defendant is Resource Capital Corp. ("Resource Capital"), a Maryland *764 real estate investment trust that invests in commercial and residential real estate assets.
The corporate defendants are Resource Capital Manager, Inc. ("Resource Manager") and Resource America, Inc. ("Resource America"). Resource Manager is an asset management company that manages Resource Capital, and is a wholly owned subsidiary of Resource America. Resource America was acquired by C-III Capital Partners LLC ("C-III") in September 2016.
Ten of the individual defendants (Steven J. Kessler, Walter T. Beach, Edward E. Cohen, Jonathan Z. Cohen, Richard L. Fore, William B. Hart, Gary Ickowicz, Murray S. Levin, P. Sherrill Neff, and Stephanie H. Wiggins) are current or former board members of the company. Jonathan Cohen is also the former CEO, and is the son of Edward Cohen. The remaining three individual defendants (David J. Bryant, Eldron C. Blackwell, and David E. Bloom) are officers.
During the relevant time period, Jonathan and Edward Cohen were the largest stockholders of Resource America, collectively owning approximately 30% of its shares. Compl. (Dkt. No. 105) ¶ 5. They both resigned from Resource Capital's board when C-III acquired Resource America in September 2016, and were replaced by nonparties Andrew L. Farkas and Jeffrey P. Cohen.[2] Farkas is the founder and CEO of C-III, as well as the managing member, chairman, and CEO of Island Capital Group LLC, C-III's parent company. Jeffrey Cohen is an executive managing member of C-III, president of Island Capital, and a director and executive vice president of Resource America.
OVERVIEW OF THE ISSUES
The complaint seeks recovery of damages from the individual defendants on claims that they abused their positions as directors and tolerated or participated in, and concealed, activities which caused loss or damage to Resource Capital. These claims fall generally into three categories: (i) the retention for too long of a deteriorating investment in a $38.1 million mezzanine loan secured by hotels in Puerto Rico, whose economy was disintegrating; (ii) describing that loan as "performing" and "current" when in fact it was regarded as "impaired" and its interest payments had been reduced and deferred; and (iii) allowing Resource Capital to make excessive payments under a management agreement to entities owned by the Cohen family, whose members dominated and controlled Resource Capital's board.
The plaintiffs claim that making a demand upon the board (otherwise required by Maryland law) to remedy the circumstances would be futile: rejection by the wrongdoers would be all but foreordained.
The defendants seek dismissal of the complaint for lack of compliance with the demand requirement. They argue that there is no justification for dispensing with what Maryland law prescribes.
In these situations, the court abjures adjudication of the merits of the underlying claims, and considers only whether the defendants would weigh them fairly and in the corporation's best interest. Yet that process is somewhat circular: if the directors are asked to appraise their own work, there lingers a suspicion that the worse their behavior the less likely they are to favor litigation based on it. Therefore, the determination whether a demand *765 would be futile rests on a different basis under the law. It is whether the plaintiffs show that a majority of the directors are so personally and directly conflicted or committed to the challenged decision that they would not respond to the demand with good faith business judgment, in the best interest of the company.
For the reasons stated below, in this case the plaintiffs fail to pass that test, and the complaints are dismissed. The charge that the directors would not respond to the demand "in good faith and within the ambit of the business judgment rule" has insufficient support.
STANDARD
"Directors are presumed to act properly and in the best interest of the corporation. They enjoy the benefit and protection of the business judgment rule, and their control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing." Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123, 144 (2001). To protect and enforce the application of the principle that managing the business is the work of its directors, not of the courts, a shareholder seeking to pursue a claim on behalf of the corporation must first let the directors decide whether its assertion is in the corporation's best interest, by making a demand on the board to bring the litigation itself, unless he shows that the demand should be excused as futile. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95-96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). To establish that exception to the demand requirement, a shareholder who brings a derivative claim without first making a demand on the directors must "state with particularity" his reasons. Fed. R. Civ. P. 23.1.
Resource Capital is a Maryland corporation. In Werbowsky, supra, the Court of Appeals of Maryland set forth its standard for where the "very limited exception" of demand futility applies. It is:
when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.
Werbowsky, 766 A.2d at 144. Demand is not excused:
simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action.
Id. at 143-44.
As our circuit has observed, "demand is rarely, if ever, properly excused under Maryland law." Kautz v. Sugarman, 456 Fed.Appx. 16, 19 (2d Cir. 2011).
It is clear that a director's participation in the challenged transaction does not of itself disqualify him. See, e.g., Sekuk Global Enters. Profit Sharing Plan v. Kevenides, No. 24-C-03-007496, 2004 WL 1982508, at *7 (Md. Cir. Ct. May 25, 2004) (refusing to consider allegation that directors breached their fiduciary duties in determining demand futility); In re Infosonics Corp. Deriv. Litig., No. 06 Civ. 1336, 2007 WL 2572276, at *8 (S.D. Cal. Sept. 4, 2007) (holding that allegations that directors improperly approved backdated *766 stock options did not excuse demand). Allegations that the defendants were members of the committee that "allowed or permitted false and misleading statements to be disseminated in the company's SEC filings, failed to ensure that adequate internal controls were in place, and reviewed and approved the Company's credit loss reserve policy" were held not to excuse demand in Kautz v. Sugarman, No. 10 Civ. 3478, 2011 WL 1330676, at *9 (S.D.N.Y. Mar. 31, 2011) (internal quotation marks and citation omitted), aff'd, 456 Fed.Appx. 16 (2d Cir. 2011). Likewise, in Scalisi v. Fund Asset Mgmt. L.P., 380 F.3d 133, 136 (2d Cir. 2004), the Second Circuit concluded that the directors of a Maryland corporation could review in good faith a demand for suit against a Merrill Lynch entity, although they sat on the boards of 49 funds managed by Merrill Lynch.
The question is not whether the business decision was a good or bad one. The legal issue is whether the directors are so conflicted or committed to it that they cannot be expected to re-examine it, in hindsight, in good faith. Werbowsky, 766 A.2d at 144.
DISCUSSION
1. The Mezzanine Loan
Resource Capital's investment portfolio contains approximately $2 billion in real estate assets. It includes "mezzanine loans that are senior to the borrower's equity in, and subordinate to a mortgage loan on, a property." Annual Report (Form 10-K) at 8 (Mar. 16, 2017).
In 2007, Resource Capital acquired the mezzanine loan for $38.1 million. The loan, which was originally made to affiliates of The Blackstone Group, L.P. ("Blackstone"), was secured by a portfolio of thirteen luxury hotels, three of which were located in Puerto Rico. That portfolio secured $742.5 million of debt securitized through the Wachovia Bank Commercial Mortgage Trust, 2007-WHALE8.
In about 2006, the Puerto Rican economy began to recede, and it continued to deteriorate even after the U.S. mainland economy began to recover around 2013. Puerto Rico's economic problems were amplified by bank distress and a credit crunch, and the Commonwealth faced a debt crisis.
The mezzanine loan was restructured in September 2012 to provide concessions to Blackstone, including an extension of the loan's maturity date and the deferral of interest payments. The terms of the restructuring required Blackstone to sell the properties securing the loan in order to pay down its debt.
On November 9, 2012, Resource Capital made its first public filing after the 2012 restructuring; it recognized that the borrower was in financial difficulty. Its Quarterly Report (Form 10-Q) at 27, 71 (Nov. 9, 2012) displayed a table of Troubled Debt Restructurings that showed $38,072,000 of such mezzanine loan restructurings in the loan portfolio, and stated that the company "considers a loan to be impaired if ... the loan is deemed to be a troubled-debt restructuring ('TDR') where a concession has been given to a borrower in financial difficulty." Id. at 11. Further, it disclosed the deferral of interest on the loan: "Fixed rate mezzanine loans include a mezzanine loan that was modified into two tranches which both currently pay interest at 0.50%. In addition, the subordinate tranche accrues interest at LIBOR plus 18.50% which is deferred until maturity." Id. at 20 n.7, 65 n.7.
The loan was restructured again in 2014, and was again identified as a Troubled Debt Restructuring in the first public filing after that restructuring. Quarterly Report (Form 10-Q) at 29-30 (Nov. 10, 2014).
*767 Nevertheless, from March 2013 to May 2015, the defendants repeatedly stated during earnings conference calls and in Resource Capital's annual and quarterly reports that the company's commercial real estate loans were "current" and "performing." Compl. ¶¶ 8, 77-102. According to the complaint:
while Puerto Rico's economy continued to decline and face economic crisis, the Individual Defendants repeatedly made misleading statements and/or omitted material information concerning the Company's exposure to the Puerto Rican economy in order to inflate the value of the Mezzanine Loan and continue receiving bloated fees pursuant to the Management Agreement.
Id. ¶ 72. The proxy statements that Resource Capital filed in advance of its annual meetings in 2014 and 2015 did not discuss the mezzanine loans or management fees, and its shareholders were not asked to vote on investment decisions during those meetings. Id. ¶¶ 102-113.
It was not until May 2015, when the three hotels in Puerto Rico were the last remaining properties in the portfolio, that a combination of events occurred which jeopardized Blackstone's ability to repay the loan. Blackstone attempted to obtain a long-term bridge loan that would allow it to sell the remaining hotels at favorable prices; instead, it could only obtain a one-year bridge loan with a high interest rate, forcing it to sell the remaining hotels quickly in a difficult market. In July 2015, Blackstone sold one of the remaining properties at a very low price. Meanwhile, Puerto Rico's economy was declining rapidly, and the Commonwealth defaulted on a public debt payment on August 1, 2015. At that point, the company determined that it was unlikely to recover on the mezzanine loan.
Accordingly, Resource Capital recorded a $41.1 million impairment of the loan for the second quarter of 2015. Its independent auditor reviewed and approved both the description and the timing of that impairment. The company disclosed the impairment in a press release on August 4, 2015: "The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved." Compl. ¶ 114. Following the announcement, Resource Capital's market capitalization dropped 12.36%, Id. ¶ 118, and its share price dropped from $3.48 to $3.05, Decl. of Christopher Y.L. Yeung (Dkt. No. 108), Ex. E (RSO Share Price History). Resource Capital also discussed the mezzanine loan during an earnings conference call on August 5, 2015, Compl. ¶ 115, and disclosed the impairment in its quarterly report filed on August 7, 2015, Compl. ¶ 119.
Within two weeks, the company's share price rebounded to $3.41. Yeung Decl., Ex. E.
2. "Performing" and the Business Judgment Rule
The plaintiffs make much of the frequent characterization, in the company's public statements, of the mezzanine loan as "performing" or "current"-as did the October 5, 2016 opinion in the class securities litigation, Levin v. Resource Capital Corp. [3] That opinion stated:
With regard to the $41,100,000 Mezzanine Loan, the statements that it was "performing" or "current" are accurate *768 only in the special sense that its performance complied with its "troubled-debt" restructuring in September 2012 under which it stopped paying interest on its loan, as a concession "given to a borrower in financial difficulty." (Resource's Form 10K December 31, 2012, p. 97) Under that concession, the borrower in financial difficulty was "current" and "performed" by not paying interest: a counter-intuitive use of those characterizations.
To describe the Mezzanine Loan as "performing" or "current" without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was, in the words of SEC Rule 10b-5 "... to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." That pleads a prima facie violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).
Id. at *1.
That opinion, upholding the sufficiency of the pleadings, did not mention and gave no consideration to the scope of Maryland's business judgment rule. The rule is a matter of defense. The parties agree that Maryland law and its broad business judgment rule apply to these cases. Now it must be addressed: the business judgment rule is germane to the issue of whether demand on the board would have been futile.
As discussed below, taken singly or cumulatively, the allegations in the complaint do not show with the particularity required by Maryland law that the board could not fairly evaluate a demand within the scope of the business judgment rule.
The Defendants' Approval of Public Filings
The fact that the Resource Capital directors approved SEC filings and other public statements regarding the mezzanine loan does not of itself excuse demand. It amounts to no more than saying they participated in the challenged transaction, which is insufficient to establish demand futility, see supra pp. 765-66, and the impairment of the loan was disclosed in the 2012 Form 10-Q and later filings, see supra pp. 766-67.
Resource Capital's independent auditor reviewed and signed off on the company's annual reports between 2012 and 2015, and the directors were entitled to rely on that sign-off. See Md. Code Ann., Corps. & Ass'ns § 2-405.1(d)(1) ("A director is entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by ... A lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence.").
The Defendants' Service on Other Committees
Nor does the defendants' service on board committees disqualify them from evaluating a demand regarding the mezzanine loan disclosures. Some of Resource Capital's board members served on the investment committee (Beach, Kessler, Ickowicz, and Fore) and the audit committee (Neff, Beach, Hart, and Wiggins). The investment committee was established "to review and consider all proposed investments by our company equal to or in excess of $12.5 million." Proxy Statement (Form DEF 14A) (Apr. 18, 2013).
The complaint alleges that, because the investment committee held 60 meetings after the 2012 restructuring, "the nonperformance of the loan would have been and was discussed as part of the Investment Committee's discussions concerning the *769 Company's progress in achieving its investment objectives." Compl. ¶ 162. According to the plaintiffs, the investment committee's discussions demonstrate the directors' "knowledge of and active efforts to conceal the true nature of the Mezzanine Loan." Id. ¶ 163.
Those allegations, taken as true, do not excuse demand. Under Maryland law, demand is not futile merely because a director served on a board committee with responsibilities that extended to the transaction in dispute. See Weinberg v. Gold, 838 F.Supp.2d 355, 360 (D. Md. 2012) ("Simply being members of the board or the compensation committee and participating in the decision-making do not suffice"); Seidl v. Am. Century Cos., Inc., 713 F.Supp.2d 249, 261 (S.D.N.Y. 2010) (allegation that board members must have known about misstatements concerning the company's investment because they received regular reports about investments does not excuse demand), aff'd, 427 Fed.Appx. 35 (2d Cir. 2011) ; Caston v. Hoaglin, No. 2:08 Civ. 200, 2009 WL 3078214 (S.D. Ohio Sept. 23, 2009) ("neither membership on a committee nor knowledge of alleged wrongdoings establishes demand futility").
The complaint describes the directors' "particular duties" on the board and identifies the "specific committees" on which they served. Plaintiff's Brief at 53. Yet it does not allege any specific information, unknown to the public, that those directors received which should have made them act differently in retaining the investment (a drop in price from widely shared adverse circumstances is often viewed as a buying opportunity) or disclosing the status of the mezzanine loan, let alone information that would render them incapable of evaluating a demand in good faith.
3. The Management Agreement and Cohen Family "Control" of the Board
Claiming the board was "committed" to maintaining the "façade" that the mezzanine loan was performing, the plaintiffs point to Resource Capital's management agreement and the Cohen family's alleged control of the board. Compl. ¶¶ 155-156. The complaint alleges that the management agreement was grossly unfair to Resource Capital because it enriched the Cohen family (Resource America's stockholders) at the expense of Resource Capital, which was forced to pay a monthly management fee and an "exorbitant" one-time termination fee. Compl. ¶¶ 4, 55. Moreover, the plaintiffs claim that the Cohens obtained the board's approval of the management agreement because they "dominated and controlled the board based on their ownership interest in Resource America and the other Cohen family entities," and hand-picked the majority of Resource Capital's board. Compl. ¶ 14. The complaint maps the overlapping business relationships among Kessler, Levin, Neff, Beach and various "Cohen family entities." Id. ¶ 14, Ex. 1 (Resource Capital Corp. (RSO) Defendant Conflicts Map). Those relationships allegedly impelled allegiance to the Cohen family such that the directors personally committed themselves to concealing the true state of the mezzanine loan. The plaintiffs further claim that the directors who replaced them on the Resource Capital board (Farkas and Jeffrey Cohen) are also beholden to the Cohen family by virtue of those nonparties' affiliations with Resource America, C-III, and C-III's parent company,[4] thus having an interest in *770 keeping the management agreement in place.
The Management Agreement
The complaint's allegations that the management agreement is "exorbitant" and "grossly unfair" to Resource Capital are epithets needing factual support. Nowhere does the complaint allege that base management fees are unreasonable or uncommon, or by what standards the one-time termination fee is exorbitant. Those aspects of the management fee, as well as the fact that it was not negotiated at arm's-length, were first publicly disclosed in Resource Capital's SEC filings twelve years ago. Resource Capital has publicly disclosed the risks that related to the management agreement in a section of its annual reports entitled "Risks Related to Our Manager":
We depend on our Manager, C-III and Resource America to develop and operate our business and may not find suitable replacements if the management agreement terminates.
Apart from persons employed by PCM, our residential mortgage subsidiary, we have no employees. Our officers, portfolio managers, administrative personnel and support personnel are employees of Resource America. We have no separate facilities and, except for PCM's operations, completely rely on our Manager and, because our Manager has no direct employees, Resource America and C-III, which has significant discretion as to the implementation of our operating policies and investment strategies. If our management agreement terminates, we may be unable to find a suitable replacement for our Manager. Moreover, we believe that our success depends to a significant extent upon the experience of the portfolio managers and officers of our Manager, C-III and Resource America who provide services to us, whose continued service is not guaranteed. The departure of any such persons could harm our investment performance.
We must pay our Manager the base management fee regardless of the performance of our portfolio.
Our Manager is entitled to receive a monthly base management fee equal to 1/12 of our equity, as defined in the management agreement, times 1.50%, regardless of the performance of our portfolio. Our Manager's entitlement to substantial non-performance based compensation might reduce its incentive to devote its time and effort to seeking profitable opportunities for our portfolio. This in turn could hurt our ability to make distributions to our stockholders.
* * *
Our management agreement was not negotiated at arm's-length and, as a result, may not be as favorable to us as if it had been negotiated with a third-party.
At the time the management agreement was negotiated, two of our former officers and directors, Edward E. Cohen and Jonathan Z. Cohen, were also officers or directors of our Manager or Resource America. As a consequence, our management agreement was not the result of arm's-length negotiations and its terms, including fees payable, may not be as favorable to us as if it had been negotiated with an unaffiliated third-party.
Termination of the management agreement by us without cause is difficult and could be costly.
Termination of our management agreement without cause is difficult and could be costly. We may terminate the management agreement without cause only annually upon the affirmative vote of at least two-thirds of our independent directors or by a vote of the holders of at least a majority of our outstanding common *771 stock, based upon unsatisfactory performance by our Manager that is materially detrimental to us or a determination that the management fee payable to our Manager is not fair. Moreover, with respect to a determination that the management fee is not fair, our Manager may prevent termination by accepting a mutually acceptable reduction of management fees. We must give not less than 180 days' prior notice of any termination. Upon any termination without cause, our Manager will be paid a termination fee equal to four times the sum of the average annual base management fee and the average annual incentive compensation earned by it during the two 12-month periods immediately preceding the date of termination, calculated as of the end of the most recently completed fiscal quarter before the date of termination.
E.g., Annual Report (Form 10-K) at 23 (Mar. 16, 2017).
The mezzanine loan and management agreement matters reflect disputed business judgments. No showing is made that a majority of the board is so conflicted or committed to them that the board cannot be expected to respond to a demand in good faith.
Cohen Family "Control" of the Board
Moreover, the allegations in the complaint regarding Cohen family control of the board are insufficient to excuse demand under Maryland law. Not only did Jonathan and Edward Cohen leave their positions on the board four months before this action was commenced (and evaluation of the demand would be done by others), but they also divested their Resource America stock (30% of Resource America's total shares) at that time. Even had they retained their stock, courts have held that stock ownership of much more than 30% is insufficient to prove domination and control of the board. See, e.g., Beam v. Stewart, 845 A.2d 1040, 1054 (Del. 2004) (94%); In re IAC/InterActiveCorp Sec. Litig., 478 F.Supp.2d 574, 597, 600 (S.D.N.Y. 2007) (60%). The plaintiffs express concern that the defendants have been "hand-picked" by the Cohen family, but under Maryland law, directors are not disqualified from considering a demand solely because they "were chosen as directors at the behest of controlling stockholders." Werbowsky, 766 A.2d at 143.
Nor are those directors-including Farkas and Jeffrey Cohen-precluded from evaluating a demand solely because they are connected to other companies affiliated with the Cohen family. Although the conflicts map attached to the complaint shows affiliations between Resource Capital directors and several other Cohen entities, Compl., Ex. 1, the complaint leaves it as no more than a suspicion that the Cohen family controlled any Resource Capital directors. Case law recognizes that "the central premise of plaintiff's argument-that service on the boards of multiple funds managed by the same investment adviser renders a director unable to consider a demand in good faith-has been rejected repeatedly by courts applying Maryland law." Seidl, 713 F.Supp.2d at 261.
CONCLUSION
The motions to dismiss the plaintiffs' verified consolidated stockholder derivative complaint (Dkt. Nos. 106, 110) are granted. The Clerk is directed to enter judgment dismissing that complaint (Dkt. No. 105) and the complaint in the related action, 17 Civ. 474 (Dkt. No. 1).
So ordered.

The parties have agreed to defer briefing on other defenses to the complaint until this derivative standing issue is resolved. (Dkt. No. 104).

There is no familial relationship alleged between Jeffrey Cohen, on the one hand, and Jonathan or Edward Cohen, on the other.

Levin v. Res. Capital Corp. et al., 15 Civ. 7081 (LLS) (S.D.N.Y. Oct. 5, 2016) (Dkt. No. 36), 2016 WL 5867451.

As discussed infra pp. 764-65, Farkas is the founder and CEO of C-III, and is the managing member, chairman, and CEO of Island Capital Group, C-III's parent company. Compl. ¶ 168. Jeffrey Cohen is an executive managing member of C-III, president of Island Capital, and a director and executive vice president of Resource America. Id. ¶ 169.